UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                    :
LOUIS PSIHOYOS and JAMES P. REED ,                  :
                                                    :
                          Plaintiffs,               :          10 Civ. 5912 (JPO)
                                                    :
              -v-                                   :          MEMORANDUM
                                                    :          AND ORDER
PEARSON EDUCATION, INC.; R.R.                       :
DONNELLEY & SONS COMPANY; COURIER                   :
CORPORATION; and FAILSAFE MEDIA                     :
COMPANY,                                            :
                                                    :
                          Defendants.               :
                                                    :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

        Plaintiffs Louis Psihoyos and James P. Reed bring this action for copyright infringement

against Defendants Pearson Education, Inc. ("Pearson") and R.R. Donnelley & Sons Company,

Courier Corporation, and Failsafe Media Company (collectively, the "Printer Defendants").

Plaintiffs allege that Pearson published, and the Printer Defendants printed, books containing

unauthorized copies of images to which Plaintiffs hold the copyright.

        Plaintiffs move, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"),

for summary judgment on their copyright infringement claims against Defendants, and for

summary judgment that, as a matter of law, the infringements committed by Defendants were

"willful" for purposes of 17 U.S.C. § 504(c)(2).  (Dkt. No. 73.)

        For the reasons that follow, Plaintiffs' motion for summary judgment on copyright

infringement is denied in part and granted in part, and Plaintiffs' motion for summary judgment

as to willfulness is denied.

## I.      Background

### A.      Factual Background

Unless otherwise noted, the following facts are undisputed and are derived from the

parties' Local Civil Rule 56.1 statements, affidavits, and other submissions. The Court construes

all evidence in the light most favorable to the non-moving party and draws all inferences in the

non-moving party's favor.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 255 (1986).

#### 1.   The Parties

Plaintiffs Louis Psihoyos and James P. Reed are professional photographers who make

their livings, in part, by licensing their photographs to third parties.

Defendant Pearson is a publishing company specializing in educational publications.

The Printer Defendants are printing companies that published the allegedly infringing

publications at issue in the case.

#### 2.   Works at Issue

Plaintiffs claim that Defendants infringed their copyrights in the following four works,

each of which was created by one of the two Plaintiffs.  "Tyrannosaurus Being Cleaned"

("Tyrannosaurus") is a photograph taken by Mr. Psihoyos.  Mr. Psihoyos registered the copyright

in the photograph under registration number VA 1-747-473 in November 2010.  (Declaration of

Daniel A. Nelson in Support of Plaintiffs' Motion for Partial Summary Judgment ("Nelson

Dec.") Exs. 21-22.)  "One Hundred Monkeys Type Shakespeare" ("Monkeys") is an image

depicting several monkeys in various poses around computer terminals in what appears to be a

library reading room.  The image is a digital composite of photographs taken by Mr. Psihoyos.

Mr. Psihoyos registered the copyright in this image under registration VA 888-300 in December

1997.  (Nelson Dec. Exs. 15-17.)  "Vintage Sketch of an Iguanodon" ("Iguanodon") is a

photograph taken by Mr. Psihoyos.  Mr. Psihoyos registered the copyright in this photograph

under registration number TX 4-083-613 in August 1995.  (Nelson Dec. Exs. 18-20.)  "Storm

Researchers in Action" ("Storm") is a photograph taken by Mr. Reed.  Mr. Reed registered the

copyright in this photograph under registration number TX 6-912-618 in November 2007.

(Nelson Dec. Exs. 23-24.)

### 3.  Relationship Among the Parties

Plaintiffs licensed their photographs through stock photography agencies, including

Visions of Tomorrow, Inc. d/b/a Science Faction ("Science Faction").  Science Faction licensed

these images directly, and also, at times, licensed its catalogue through sub-agents, including

Getty Images ("Getty").  At all times relevant to this case, until December 12, 2008, the four

photographs at issue were represented by both Science Faction and Getty (collectively, the

"Agencies").  (Defendants' Statement of Additional Material Facts Pursuant to Local Rule 56.1

("Defs. 56.1 Stmt.") ¶ 79.)

Pearson includes many photographs and images in its publications.  It typically licenses

those images from agencies such as Getty and Science Faction.

In broad terms, the relationship between Pearson and the Agencies was as follows:

Pearson obtained access to view images offered by the Agencies, in order to determine which

images were appropriate for their various publications.  Pearson would decide which images it

wanted to use for a given publication, and would then negotiate licenses to use those images.

Pearson and the relevant agency would then enter into non-exclusive license agreements under

which permission was granted for a specified use of each image in exchange for payment of an

agreed-upon fee.

The relationship and course of conduct among the parties was governed, in part, by a series of different agreements.

### a.        License Agreements

In order to obtain permission to publish an image represented by an agency, Pearson would enter into a license agreement with the agency for that image.  The record contains examples of the license agreements used by Getty and Science Faction.  These agreements— which appear to be form agreements that were attached to the invoices sent by the Agencies to Pearson—govern Pearson's usage of the particular images.[1]  The Getty Images Editorial Rights Managed and Rights-Ready Image and Footage License Agreement ("Getty License Agreement") grants "a non-exclusive, non-sublicensable and non-assignable right to use and Reproduce the Licensed Material . . . solely to the extent explicitly stated in th[e] Agreement." (Nelson Dec. Ex. 43, Getty License Agreement ¶ 2.1.)  The agreement also provides that "[n]o ownership or copyright in any Licensed Material shall pass to Licensee by the issuance of the license contained in this Agreement.  Except as expressly stated in this Agreement, Getty Images grants Licensee no right or license, express or implied, to the Licensed Material."  (*Id.* ¶ 3.1.) The agreement further provides that

> [a]ny use of Licensed Material in a manner not expressly authorized by this Agreement or in breach of a term of this Agreement constitutes copyright infringement, entitling Getty Images to exercise all rights and remedies available to it under copyright laws around the world.  Licensee shall be responsible for any damages resulting from any such copyright infringement, including any claims by a third party.

(*Id.* ¶ 10.1.)  Finally, the Getty License Agreement states:

---

[1] The license agreements used by Getty and Science Faction are, for purposes of this case, substantially identical. Thus, although the Court quotes directly from only the Getty agreement, the Science Faction agreement contains the same provisions.  (*See* Nelson Dec. Ex. 43 and Declaration of Daniel A. Nelson in Support of Plaintiffs' Reply Memorandum ("Nelson Reply Dec.") Ex. 50, Science Faction Images / Jewel Box Images – Rights Managed Image License Agreement.)

No action of either party, other than express written waiver, may be construed as a waiver of any provisions of this Agreement.  A delay on the part of either party in the exercise of its rights or remedies will not operate as a waiver of such rights or remedies, and a single or partial exercise by either party of any such rights or remedies will not preclude other or further exercise of that right or remedy.  A waiver of a right or remedy on any one occasion will not be construed as a bar to or waiver of rights or remedies on any other occasion.

(*Id.* ¶ 10.7.)[2]

### b.    Image Storage Agreements

One way in which Pearson was able to view the Agencies' images to make selections for its publications was by placing portions of the Agencies' catalogue on an internal database called the Pearson Asset Library ("PAL").  This process was governed by separate contracts with the Agencies.  In June 2005, Getty and Pearson entered into Getty's Image Storage Agreement. (Nelson Dec. Ex. 3, Getty Images' Image Storage Agreement ("ISA").)

Under that agreement, Getty agreed to "deliver to Pearson, for inclusion in the [PAL], digital copies of images . . .  pursuant to Pearson's research requests or special requests made periodically by Pearson."  (*Id.* at 1.)  Getty granted to Pearson a non-exclusive license to view the images, and to reproduce the images "in order to store the Images, on the PAL for the purpose of aiding Pearson in its image licensing decisions."  (*Id.*)

The parties carefully limited the rights granted by the Image Storage Agreement:

Pearson acknowledges that no actual image reproduction rights, outside of inclusion on the PAL, are granted by this Agreement. Any other use of the Images requires Pearson and Getty Images to enter into a separate license agreement, requiring the payment of license fees to Getty Images by Pearson in exchange for Pearson's right to reproduce and use the Images.  Getty Images retains and reserves all rights, title, and interest in and to the Images, except as specifically provided herein.  There are no implied licenses to any of the Images.

(*Id.*)

---

[2] The comparable provisions in the Science Faction agreement appear in paragraphs 2.1, 3, 11.1 and 11.4.  (*See* Nelson Reply Dec. Ex. 50.)

The agreement further provided that "[d]uring the Term [of the agreement], Getty Images may notify Pearson that it no longer has the right to view an Image or Images for any reason.  In that event, Pearson will remove such Image from the PAL."  (*Id.*)  The agreement included a warranty by Getty that "it has the full right and authority to enter into and perform this Agreement, including, but not limited to, the right and authority to grant all rights and licenses granted in this Agreement."  (*Id.* at 2.)

Of the four images at issue in this case, the record only confirms that one of them—"Storm"—was included in the PAL.  (Defs. 56.1 Stmt. ¶ 119.)  The record is not clear on whether the other three images were also included in the PAL.  Two of the images—"Tyrannosaurus" and "Iguanodon"—were included in publications issued by Pearson's "Curriculum Group," which did not use the PAL, but this does not mean that the images were not also at one time included in the PAL.  (*Id.* ¶ 118.)

### c.  Preferred Vendor Agreements

The relationship between Pearson and the Agencies was further governed by what the parties refer to as Preferred Vendor Agreements.  These agreements, intended to streamline the licensing process, provided set prices for the licensing of images represented by the particular agency.  Under the agreements, the prices were determined by the size and location within the publication of the particular image, as well as the size of the print run and the duration of the usage.  (*See* Nelson Dec. Ex. 31, Preferred Vendor Discount Price Agreement ("PVA").)

The Preferred Vendor Agreements did not grant any actual usage rights to the images.  Under the Preferred Vendor Agreement with Getty, the parties agreed that the agreement would serve as an addendum to the License Agreements, and "[e]xcept as specifically provided for [t]herein, th[e Preferred Vendor Agreement] does not broaden the scope of the License

Agreement(s)." (*Id.* at 1.) The parties to the Preferred Vendor Agreement agreed that "individual licenses will be granted by Licensor to Licensee subject to the terms and conditions of the License Agreement(s)." (*Id.*)[3]

### d.   Course of Conduct

The actual operation of these agreements and the licensing process is sharply disputed by the parties, and indeed, forms the core of the parties' disagreement.

Defendants contend that under the Preferred Vendor Agreements, since the price of each license was determined by the size and location within the publication of the images, and that since final decisions about such matters were not made until very late in the production process, a practice developed whereby Defendants would not formally seek a license for the use until, or even after, publication of the work. (*See* Declaration of Elisabeth Brenzel ("Brenzel Dec.") ¶ 4.) In support of this contention, Defendants have submitted numerous invoices from Getty showing a "start date" of a license (*i.e.*, the date on which the permitted use begins) that is weeks, months, or even over a year earlier than the date of the invoice itself. (*See* Declaration of Ezra D. Church in Support of Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and Request Under Rule 56(D) ("Church Dec.") Ex. G.) Defendants submit only two such examples from Science Faction. (*See* Church Dec. Ex. H.) Defendants contend that representatives of Getty were aware of and approved this practice. (*See* Brenzel Dec. ¶¶ 7-8 ("Getty were [*sic*] informed, during regular meetings that took place with Getty's representatives, and never objected to, the practice of receiving billing requests and finalizing permission documents after publication. I personally attended meetings with representatives of Getty where the practice of finalizing billing for permission after publication was discussed."); Church Dec. Ex. C,

---

[3] The comparable agreement with Science Faction was a Pearson form agreement that did not contain this restrictive language, and was instead, essentially, a schedule of the prices and rates for using different images. (*See* Nelson Dec. Ex. 32.)

Transcript of Deposition of Pearson Education, Inc. 30(b)(6), Karen Sanatar ("Sanatar Dep.") at 138:13-139:14.)

In addition to arguing that the relevant contracts speak for themselves, Plaintiffs submit numerous examples of invoices from Science Faction as to which the start date is at, or after, the invoice date. (*See* Nelson Dec. Exs. 50-74.) Many of those invoices contain additional restrictive language, such as "All other rights are reserved. Additional usages require advance written permission and payment." (Ex. 70.) Plaintiffs also submit testimony from representatives of Pearson that Pearson's policy and practice were not to engage in retroactive licensing. (*See* Nelson Dec. Ex. 26, Transcript of Deposition of Pearson Education, Inc. 30(b)(6), David Jolliffe ("Joliffe Dep.") at 28:20-29:20; Nelson Dec. Ex. 29, Transcript of Deposition of Julie Orr, Vol. I ("Orr. Dep.") at 67:3-68:13.)

As will be discussed further below, there is insufficient evidence in the record to resolve these factual disputes as a matter of law.

### 4. The Publications at Issue

The specific circumstances giving rise to the instant action are not in dispute. Pearson obtained all four of the images at issue from Getty some time prior to December 2008. (Plaintiffs' Statement of Material Facts Pursuant to Local Rule 56.1 ("Pls. 56.1 Stmt.") ¶ 3.) On December 12, 2008, the sub-agency agreement between Getty and Science Faction ended. (Defs. 56.1 Stmt. ¶ 91.) After that time, Getty was no longer in a position to offer licenses for images that it had previously sub-licensed from Science Faction. The parties do not dispute that Pearson was not notified of this fact at that time. Pearson later sought to obtain licenses from Getty to use the four images at issue in this case in four different publications. Each time, Getty advised Pearson that Getty no longer represented the image in question, and that Pearson would

need to communicate directly with Science Faction to obtain a license.  All four publications were published at least several months before Pearson reached out to either of the Agencies to obtain a license.

Pearson included the "Tyrannosaurus" image in a publication entitled *Intervention Student Reader, Sidewalks Student Reader 4.2*, published in early May 2009.  (Pls. 56.1 Stmt. ¶ 9.)  Pearson did not seek a license from Science Faction for that image until December 18, 2009.  On December 22, 2009 Science Faction requested that Pearson identify the publication date.  On January 5, 2010, Pearson informed Science Faction that the publication date was May 1, 2009.  Science Faction did not send Pearson an invoice or grant Pearson a license to use this image.  (*Id.* ¶ 16.)

Pearson included the "Storm" image in a publication entitled *Conceptual Integrated Science Explorations*, published on December 26, 2008.  (*Id.* ¶ 22.)  The image was included in various ancillary products associated with the title, including an Annotated Instructor's Edition and electronic versions of the book.  The image was also included in the second and third printings of the publication in June 2009 and January 2010.  On December 1, 2009 Pearson emailed Getty to obtain permission to use several images in the publication, including the "Storm" image.  On January 29, 2010, Getty informed Pearson by email that it no longer had the rights to license the "Storm" image because it was part of the Science Faction collection.  On February 25, 2010, Pearson emailed Science Faction directly to seek a license.  Science Faction requested the date of publication, and Pearson responded that the book was published on "1/2/09."  (*Id.* ¶ 30.)  Science Faction did not send Pearson an invoice or grant Pearson a license to use this image.  (*Id.* ¶ 31.)

Pearson included the "Iguanodon" image in a publication entitled *Concept Literacy Reader Grade 5, Week 3, Unit 3, "Picturing the Past,"* published on or about August 28, 2009. (*Id.* ¶ 34.)  The image was also included with various ancillary products associated with this title, published at the same time.  On November 24, 2009, Pearson sent an email to Science Faction requesting an invoice and license to publish this image.  That request contained a "Work Order" that stated that Pearson was "working on a program entitled Reading," but did not disclose that the publication at issue had already been published.  (Nelson Dec. Ex. 11.)  On February 1, 2010, Science Faction emailed Pearson to ask the publication date of the book, and the next day, Pearson replied via email that the publication date was "7/24/09."  (Nelson Dec. Ex. 12.) Science Faction did not send Pearson an invoice or grant Pearson a license to use this image. (Pls. 56.1 Stmt. ¶ 41.)

Pearson included the "Monkeys" image in a publication entitled *Perspectives on Argument*, published October 31, 2008.  (Pls. 56.1 Stmt. ¶¶ 45-46.)  Between April 2009 and September 2009, Pearson issued several different prints of different versions of this title.  On January 15, 2010, Pearson emailed Science Faction to seek permission to use the image.  On January 20, 2010, in response to Science Faction's question, Pearson sent Science Faction an email stating, "This title was actually published in November of 2008.  We initially contacted Getty Images to license this image.  However, they have only contacted us 2 weeks ago to inform us that they were never able to license this image and that we would need to contact Science Faction directly."  (Nelson Dec. Ex. 13.)

On August 26, 2010, after this litigation had been initiated, Pearson sent Science Faction an email regarding the "Monkeys" image, stating that Pearson "ha[d] not received a response to [its] original permission request sent on December of 2009."  (Nelson Dec. Ex. 14.)  When asked

the publication date, Pearson responded, "The publication is a 2009 copyright and the date was November 15, 2008.  Throughout the last year, Pearson has gone through a re-organization and now we are trying to clear up any outstanding invoices or permissions."  (*Id.*)  Science Faction did not send Pearson an invoice or grant Pearson a license to use this image.

**B.     Procedural History**

Plaintiffs initiated this action against Pearson on August 5, 2010.  Initially, the case was before the Honorable Jed S. Rakoff, United States District Judge.

On September 29, 2010, Pearson moved to dismiss the complaint for failure to state a claim for copyright infringement, arguing that the complaint did not provide any information about the copyright registrations for the works at issue.

On November 2, 2010, the Court held an initial conference in the case.  On November 3, 2010, the Court issued a case management plan that allowed amendment of the complaint without leave of court until January 19, 2011.  (Dkt. No. 14.)

At the November 2 conference, the Court also heard argument on the motion to dismiss and asked Plaintiffs to submit to Pearson by November 9, 2010 copyright registration numbers for the four images at issue in the complaint.  On a conference call held November 8, 2010, Plaintiffs stated that they would not provide this information absent a court order.  Accordingly, on November 10, 2010, the Court issued an order to provide the registration numbers to Pearson on pain of contempt.  (Dkt. No. 15.)  On November 22, 2010, the Court denied Plaintiffs' motion to reconsider the November 10 Order and ordered that Plaintiffs provide the registration numbers by November 24, 2010.  (Dkt. No. 20.)

On November 24, 2010, Plaintiffs submitted a letter to the Court and to Pearson purporting to contain the registration numbers associated with the four works at issue.

11

Accordingly, the Court dismissed Pearson's motion to dismiss as moot on November 30, 2010. (Dkt. No. 21.)

On November 29, 2010, the parties convened a joint conference call to the Court to request the Court's intervention in a discovery dispute between the parties. Specifically, Pearson objected to producing documents relating to all photographs of Plaintiffs that appear in Pearson's publications, seeking to limit discovery to documents relating to the four images at issue in the case. The Court agreed that Plaintiffs' request was "grossly overbroad," noting that parties have "no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." (Dkt. No. 22 at 2 (quoting Fed. R. Civ. P. 26(b), Adv. Comm. Note to Subdivision (b)(1).) On January 18, 2011, the Court denied Plaintiffs' motion to reconsider this ruling. (Dkt. No. 38.)

On December 14, 2010, Pearson answered the Complaint. (Dkt. No. 25.)

On December 22, 2010, Plaintiffs filed an Amended Complaint that added new allegations and also added as defendants R.R. Donnelley & Sons Company; Courier Corporation; Failsafe Media Company; Bradford & Bigelow, Inc.; and Lehigh Phoenix. (Dkt. No. 31.)

On January 17, 2011, Pearson filed a motion to dismiss Count II of the Amended Complaint. (Dkt. No. 36.) However, before the briefing of this motion was complete, Plaintiffs filed a Second Amended Complaint on January 19, 2011. (Dkt. No. 39.) Accordingly, the Court later dismissed Pearson's motion to dismiss as moot. (Dkt. No. 72.)

Pearson answered the Second Amended Complaint on February 7, 2011. (Dkt. No. 44.) The other defendants answered on February 16, 2011. (Dkt. Nos. 46-54.)

On March 10, 2011, Plaintiffs filed a motion to strike certain defenses contained in Defendants' Answers. (Dkt. No. 57.) Rather than oppose this motion, Defendants filed

12

Amended Answers to the Second Amended Complaint on March 25, 2011.  (Dkt. Nos. 60-71.)

The Court dismissed Plaintiffs' motion to strike as moot on August 23, 2011.  (Dkt. No. 72.)

On September 6, 2011, Plaintiffs filed the instant motion for partial summary judgment.

(Dkt. No. 73.)  On September 12, 2011, Defendants filed a motion for partial summary judgment

on the issue of whether the copyright in the "Tyrannosaurus" image was registered after the

alleged infringement, thereby rendering Plaintiffs ineligible to obtain statutory damages or

attorney's fees for alleged infringements of the image.  (Dkt. No. 75.)

On September 30, 2011, the case was reassigned to the undersigned pursuant to this

District's Rules for the Division of Business Among District Judges governing the reassignment

of cases to new district judges.

The Court heard oral argument on the motions on October 11, 2011.

In Plaintiffs' submissions in opposition to Defendants' motion, Plaintiffs conceded that

the copyright in the "Tyrannosaurus" image was registered after the alleged infringements.

Accordingly, the Court granted Defendants' motion for partial summary judgment from the

bench.

On December 2, 2011, Bradford & Bigelow, Inc. and Lehigh Phoenix were terminated

from the case, leaving as Defendants only Pearson and the Printer Defendants.

## II.   Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could

return a verdict for the non-moving party.  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,

137 (2d Cir. 2009).  A "material" fact is one that might "affect the outcome of the suit under the

governing law." *Id.* The moving party bears "the burden of demonstrating that no material fact

exists." *Miner v. Clinton Cnty., New York*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v.

Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

In resolving this inquiry, the Court must construe "the evidence in the light most

favorable to the non-moving party and draw[ ] all reasonable inferences in that party's favor."

*Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255); *see

also Treglia v. Town of Manlius*, 313 F.3d 713, 718-22 (2d Cir. 2002) (noting that on summary

judgment, a court must "resolve all ambiguities and draw all factual inferences in favor of the

non-movant" (citing *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001))).  In opposing a

motion for summary judgment, the non-moving party may not rely on "conclusory allegations or

unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), or on mere

denials or unsupported alternative explanations of its conduct.  *See SEC v. Grotto*, No. 05 Civ.

5880, 2006 WL 3025878, at *7 (S.D.N.Y. Oct. 24, 2006).  Rather, the non-moving party must set

forth significant, probative evidence on which a reasonable fact-finder could decide in its favor.

*Anderson*, 477 U.S. at 256-57.  To avoid summary judgment, all that is required of the non-

moving party is a showing of sufficient evidence supporting the claimed factual dispute as to

require a judge or jury's resolution of the parties' differing versions of the truth. *See Kessler v.

Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (citing *Anderson*, 477

U.S. at 248-49).

## III.   Threshold Issues

### A.   Failure to Address All Affirmative Defenses

Defendants argue at the outset that Plaintiffs' motion for summary judgment must be

denied because Plaintiffs "fail to address" several of the affirmative defenses in Defendants'

14

Answer, particularly arguments regarding estoppel and lack of standing.  (Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Opp.") at 9.)  Plaintiffs argue that they have addressed these issues in substance, even if they did not mention them by name in their opening papers.

It is well-settled that when a party moves for summary judgment, there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case."  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *DiCola v. SwissRe Holding (North America), Inc*., 996 F.2d 30, 32 (2d Cir. 1993)) (internal quotation marks and brackets removed).

Here, Plaintiffs have presented evidence and arguments that potentially serve to negate Defendants' affirmative defenses—including the defenses not expressly addressed in Plaintiffs' opening brief.  Thus, Plaintiffs' motion for partial summary judgment is not denied on this basis.

## B.    Standing

Defendants argue that there are genuine issues of fact as to whether Plaintiffs have standing to bring this action.  Defendants base this argument on language in the license agreements entered into between Plaintiffs and Science Faction for Science Faction to serve as Plaintiffs' photograph representative.  Specifically, Plaintiffs entered into agreements under which they granted to Science Faction "an exclusive license to distribute [the images covered by the agreement] and all rights to grant sublicenses to [those images], and . . . to market, reproduce,

distribute, publish, transmit, broadcast, display, exhibit, adapt, crop, modify, recast or enhance, any [of those images]." (Church Dec. Ex. K, Rights Managed Distribution and Licensing Agreement between Science Faction and Louie Psihoyos; Ex. N, Rights Managed Distribution and Licensing Agreement between Science Faction and Jim Reed (collectively, "Science Faction Agreements") ¶ 3.1.)  Plaintiffs also agreed to grant to Science Faction "the exclusive right, at its expense, to determine in its sole and reasonable discretion, without obligation, if, and when, any legal action shall be pursued with regard to the [images]." (*Id.* ¶ 3.6.)  The agreement further provided that if Science Faction "declines to bring a claim within sixty (60) days," then the Plaintiff "retains the right to bring an action in its own name, at its own expense." (*Id.*)

Defendants argue that these provisions divested Plaintiffs of standing to bring infringement suits with regard to the images covered by this agreement.  The Copyright Act permits only the "legal or beneficial owner of an exclusive right under a copyright" to bring suit for infringement of that copyright.  17 U.S.C. § 501(b).  Defendants argue that by granting Science Faction the exclusive license to distribute the images, and the exclusive right to bring an infringement action, Plaintiffs no longer have standing to bring this infringement action as either legal or beneficial owner.

A court in this District recently addressed a similar issue in a case related to the instant action.  In *Wu v. Pearson Education, Inc.*, a class action alleging claims similar to those brought by Plaintiffs here, against some of the same defendants, the court noted that contract provisions purporting to give a third party the exclusive right to bring a copyright infringement action are "likely unenforceable."  No. 09 Civ. 6557, 2011 WL 4526078, at *7 (S.D.N.Y. Sept. 30, 2011).  The court based this conclusion on the fact that  "[c]opyright holders may not grant third parties standing to sue under the Copyright Act," and further, "may not grant the exclusive right to sue

to a third party . . . because the right to bring suit is not an exclusive right recognized by the

Copyright Act in 17 U.S.C. § 106."  *Id.* (citing *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d

881, 884-85 (9th Cir. 2005)).

In any event, in the contracts at issue here, although the agreements purported to grant

Science Faction the "exclusive license to distribute" the images, the parties agreed that the

images "shall at all times be and remain the exclusive property" of the Plaintiffs, and that the

Plaintiffs "retain[] copyright" in the images.  (Science Faction Agreements ¶¶ 2.3, 2.4.)  Indeed,

the agreements expressly state that while the parties "agree their ultimate goal is an Accepted

Image-Exclusive relationship, until such time as they mutually decide, the relationship shall be

*non*-exclusive."  (*Id.* ¶ 3.3 (emphasis added).)  Moreover, given that Plaintiffs are entitled to

receive a majority of the license fees and any awards or judgments for infringements, Plaintiffs

remain, at the least, "beneficial owners" of the copyrights in their images.  (*Id.* ¶¶ 4.1-4.2.)  *See*

*Silberman v. Innovation Luggage, Inc*., No. 01 Civ. 7109, 2003 WL 1787123, at *7 n.5

(S.D.N.Y. April 3, 2003) (noting that photographer who transferred certain exclusive rights to

agency has "standing to sue as a beneficial owner of that right, based on royalties received or

other indicia of control").  Thus, the agreement did not effectively grant Science Faction the

exclusive right to bring a lawsuit for infringement.

Finally, Plaintiffs' agreements with Science Faction provided that Plaintiffs may bring an

action if Science Faction "declines to bring a claim within sixty (60) days."  (Science Faction

Agreements ¶ 3.6.)  Defendants argue that this provision is "ambiguous at best because it does

not state what triggers the 60-day period."  (Opp. at 13.)  The Court agrees that this provision

contains ambiguities, but nevertheless, it is abundantly clear on the record that whenever the 60-

day period could have possibly begun, it has now passed.  Science Faction is certainly aware of

this litigation, and has been for well over sixty days—indeed, a Science Faction witness

submitted an affidavit in support of the instant motion.  Thus, even if the provisions of the

license agreement could be enforced to grant Science Faction the exclusive right to bring an

infringement action, that period of exclusivity has long since lapsed.

In sum, there is no genuine dispute of material fact that Plaintiffs have standing to sue

Defendants for the alleged infringements at issue, and thus summary judgment is granted to

Plaintiffs as to this issue.

### C.      Admissibility of Evidence

Defendants argue that Plaintiffs are not entitled to summary judgment because their

motion "is supported with inadmissible evidence."  (Opp. at 10.)  Specifically, Defendants argue

that the affidavit of Charlie Sliwoski is inadmissible because it is not based upon personal

knowledge.  Affidavits in support of a motion for summary judgment "must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  In addition,

Defendants point out that Plaintiffs did not disclose Mr. Sliwoski under their Rule 26(a)(1)(A)

disclosures as an individual likely to have discoverable information that Plaintiffs might use to

support their claims.  Rule 37 of the Federal Rules of Civil Procedure provides that "[i]f a party

fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not

allowed to use that information or witness to supply evidence on a motion . . . unless the failure

was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

The fact that Plaintiffs did not disclose Mr. Sliwoski specifically in their Rule 26(a)

disclosure is "harmless."  *Id.*  Mr. Sliwoski states that he is the Vice President of Editing &

Production at Science Faction.  Although Mr. Sliwoski was not included in Plaintiffs' Rule 26(a)

disclosure, Plaintiffs did disclose Roger Ressmeyer, President and CEO of Science Faction. However, Defendants apparently did not conduct any discovery of Science Faction or any of its employees.  The Court thus finds that the failure to also list Mr. Sliwoski's name did not prejudice Defendants and was therefore harmless.

This conclusion is further supported by the fact that the matters to which Mr. Sliwoski is testifying are largely non-controversial matters about which there is no serious dispute, including the fact that Science Faction represented Plaintiffs in connection with the four images at issue in this action, and that Science Faction did not grant a license to Pearson to use these images.  (*See generally* Affidavit of Charlie Sliwoski in Support of Plaintiffs' Motion for Partial Summary Judgment ("Sliwoski Aff.").)

Defendants also argue that Mr. Sliwoski's affidavit is not based upon personal knowledge.  In particular, Defendants argue that Mr. Sliwoski, as "a third party to these proceedings," cannot claim that his employment would qualify him to testify about matters concerning Reed, Psihoyos, and Getty Images.[4]  (Opp. at 11.)  But Mr. Sliwoski did not testify beyond the scope of his own knowledge.  He testified regarding Science Faction's representation of Plaintiffs' images, based upon his examination of Science Faction's catalogue.  He did not testify about matters "concerning . . . Getty Images" except to state that "*Science Faction* has no record of any license being grant[ed] by Getty Images pertaining to the use of" the images at

---

[4] Defendants also take issue with Plaintiffs' reliance on Mr. Sliwoski's affidavit to support the assertion that "[t]here is no dispute that Plaintiffs created and own the images at issue in this action."  (Opp. at 11 (quoting Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Mem.") at 1-2.))  But this argument goes to whether Plaintiff has established the facts stated; it does not affect the admissibility of the affidavit cited by Plaintiffs to support that assertion.  Similarly, Defendants object to Plaintiffs' reliance on the Sliwoski Affidavit to support the assertion that "Pearson did not obtain a license from Getty Images" to use the images at issue.  (*See* Defendants' Response to Plaintiffs' Statement of Material Facts Pursuant to Local Rule 56.1 ("Defs. 56.1 Resps.") ¶¶ 18, 32, 42.)  Defendants are correct that Mr. Sliwoski is not competent to testify to that fact, but there is also no dispute that Getty did not have authority to grant licenses to use the images at issue at the time that Pearson reached out to Getty seeking such licenses.  And, again, this argument does not affect the admissibility of Mr. Sliwoski's affidavit for whatever relevance it may have.

19

issue in this action.  (Sliwoski Aff. ¶¶ 13, 16, 19, 22 (emphasis added).)  Though that testimony

may not carry great weight, he was still testifying within the scope of his own knowledge as an

employee of Science Faction.[5]

In any event, the Court notes that even if it disregarded Mr. Sliwoski's affidavit, this

would not mandate denial of Plaintiff's motion for summary judgment unless Plaintiffs would

not be able to show an absence of issues of material fact to support their claims without that

affidavit.   As previously explained, the facts contained within Mr. Sliwoski's affidavit are

largely noncontroversial, and are either not in dispute or can be supported with other evidence in

the record.  Thus, regardless of the admissibility of Mr. Sliwoski's affidavit, Plaintiff's motion

for partial summary judgment is not denied on this basis.

## IV.   Merits of Plaintiffs' Copyright Infringement Claims

In order to establish copyright infringement, a plaintiff must show (1) that it "had a valid

copyright in the work allegedly infringed," and (2) that "the defendant infringed the plaintiff's

copyright by violating one of the exclusive rights that 17 U.S.C. § 106 bestows upon the

copyright holder."  *Island Software and Computer Service, Inc. v. Microsoft Corp*., 413 F.3d

257, 260 (2d Cir. 2005) (citation and quotation marks omitted).

Defendants challenge Plaintiff's motion for summary judgment on both prongs of this

test.

---

[5] The one portion of testimony that may not be based on personal knowledge is Mr. Sliwoski's statement that "[f]rom the image IDs, I can determine that Science Faction first delivered these images to Getty Images in December 2005 or later."  (Sliwoski Aff. ¶ 10.)  There, Mr. Sliwoski is, by his own admission, not testifying based upon personal knowledge, but rather upon his reading of the "image IDs."  However, the exact date when Science Faction first delivered these images to Getty Images is not a material fact, and therefore, even if his testimony is not admissible, that does not create a genuine issue of material fact precluding summary judgment.

### A.        Ownership of the Copyrights

Defendants argue that genuine issues of material fact preclude summary judgment as to Plaintiffs' ownership of the copyrights in the images at issue.

Plaintiffs have submitted certificates of registration for each work at issue.  A certificate of registration serves as *prima facie* evidence of valid ownership of a copyright, though that presumption is rebuttable.  17 U.S.C. § 410(c); *Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992).[6]  Thus, Plaintiffs have made a *prima facie* showing of ownership, and it is Defendants' burden to rebut the presumption.  *See R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 52 (S.D.N.Y. 2009).

### 1.        Works Made for Hire

Defendants base their challenge to Plaintiffs' ownership of two of the works on an argument that the works may be works made for hire, and therefore would not be owned by the Plaintiffs.  In particular, Defendants argue that "Tyrannosaurus" may have been a work for hire for *Newsweek*, and therefore owned by Newsweek, and that "Monkeys" may have been a work for hire for *National Geographic*, and therefore owned by National Geographic.  (Opp. at 14-16.)

Under the Copyright Act, ownership of a "work made for hire" vests in the author's employer.  17 U.S.C. § 201(b).  A "work made for hire" is defined as "a work prepared by an employee within the scope of his or her employment," or "a work specially ordered or commissioned for use as a contribution to a collective work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  17 U.S.C. § 101.

---

[6] Under the Copyright Act, a certificate of registration constitutes *prima facie* evidence of validity of the copyright and of the facts stated in the certificate if the registration was made "before or within five years after first publication of the work."  17 U.S.C. § 410(c).  For registrations made more than five years after first publication of the work, the "evidentiary weight to be accorded the certificate of . . . registration . . . shall be within the discretion of the court."  *Id.*

It is black letter law that a non-movant cannot "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc*., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotation marks omitted); *see also Anderson*, 477 U.S. at 252 (holding that a non-moving party must present more than a mere "scintilla of evidence" to avoid summary judgment).

Here, to meet their burden to rebut Plaintiffs' *prima facie* showing of ownership, Defendants point only to stray testimony from Mr. Psihoyos's deposition.  As to the "Tyrannosaurus" photo, Defendants point out that Mr. Psihoyos testified that he took the photo "for Newsweek" and that he answered in the affirmative to the question whether "Newsweek hired [him] to do some photographs for the story" in which the photograph first was published. (Church Dec. Ex. A, Transcript of Deposition of Louis Psihoyos ("Psihoyos Dep.") at 69:9-70:22.)  Similarly, for the "Monkeys" image, Defendants point out that Mr. Psihoyos testified that he created the image "to illustrate a story for the Information Revolution for the National Geographic."  (*Id*. 41:12-18.)

Defendants do not offer any further evidence to show any type of employment relationship between Mr. Psihoyos and the magazines, or, in the alternative, a signed writing expressly agreeing that the works would be considered works made for hire.  Standing alone, this testimony is insufficient to raise a genuine dispute of fact as to whether Mr. Psihoyos is the owner of the copyrights in those images, particularly in light of the fact that he has presented valid copyright registrations in his name for the images.  *Cf. Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350, 1375 n.14 (N.D. Cal. 1993) ("While copyright status is not determinative of employment status, and parties are free to negotiate the copyright status of any

work, the fact that [the author] retained the copyright in her writings is evidence that the parties considered themselves to be in a non-employee relationship.").  The record shows that Mr. Psihoyos has been the only party to exercise any rights to those images (beyond the initial publication in their respective magazines).  (Nelson Dec. Ex. 34, Psihoyos Dep. at 36:2-40:25, 72:2-21.)  Indeed, there is no evidence whatsoever in the record that the purported actual owners of the copyrights in these images—Newsweek and National Geographic—have ever challenged Mr. Psihoyos's ownership of the copyrights, asserted that they were works made for hire, or attempted to exercise any rights with respect to those images.[7]

Such speculative evidence does not establish a genuine dispute of fact on this issue. Further, as Plaintiffs point out, Defendants did not include the "work made for hire" defense as an affirmative defense in their Answers.  The Court need not determine whether the failure to plead this defense formally waived the argument, but notes that, had Defendants pleaded the defense, Plaintiffs presumably would have had the opportunity to adduce further evidence to establish Mr. Psihoyos's ownership of these works.  As it stands, Defendants have not pointed to evidence creating a genuine dispute of material fact that Mr. Psihoyos is not the owner of the copyrights in these two images based on the work made for hire doctrine.

---

[7] This raises the question whether Defendants have standing, as third parties to the purported employer-employee relationships, to raise a "work for hire" defense in the first place.  Courts have not dealt with this issue extensively, but the few decisions to address the issue at all have generally found that a defendant does have standing to challenge ownership on this basis.  *See International Code Council, Inc. v. National Fire Protection Ass'n, Inc.*, No. 02 C 5610,  2006 WL 850879, at *18 n. 33 (N.D.Ill. Mar. 27, 2006) ("There may be some doubt, as a policy matter, about the wisdom of permitting a non-author to challenge the copyright holder's right to enforce its copyright.  [The plaintiff] has not challenged [the defendant's] standing to voice this challenge, however, and the court need not address it at length beyond noting that the case law does appear to recognize an alleged infringer's right to mount such a challenge.") (collecting cases).  At the same time, appellate courts have cautioned that a "district court should give careful consideration where, as here, the work for hire doctrine is invoked solely as a third party defense and the asserted copyright holder has knowingly acquiesced to the plaintiff's commercial use of the work."  *Law Enforcement Training and Research Assocs. v. City and Cnty. of San Francisco*, Nos. 90-15482, 90-15638, 1991 WL 172416, at *1 (9th Cir. Sept. 4, 1991); *cf. Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1157 (9th Cir. 2010) ("It would be unusual and unwarranted to permit third parties such as the instant defendants to invoke § 101 to avoid a suit for infringement when there is no dispute between the two potential owners, and both are plaintiffs to the lawsuit.").

### 2.    Other Ownership Issues

Defendants also challenge Mr. Psihoyos's ownership of the "Monkeys" image copyright because the image is not simply a photograph, but is actually a digital composite of multiple photographs.  As Defendants point out, the caption next to the image in the original article in which the image appeared states that "digital imaging artist Lee Varis seamlessly inserted the crowd into a photograph of a reading room to create this fake."  (*See* Nelson Dec. Exp 15.)  In addition, the Copyright Public Catalog states that the "art" for the article was by Allen Carroll. (*See* Nelson Dec. Ex. 17.)

The Court concludes that this is insufficient to raise a genuine issue of material fact as to Mr. Psihoyos's ownership of the image.  Although the Copyright Public Catalog lists "art by Allen Carroll," it also lists "photos by Louie Psihoyos."  (*Id.*)  Mr. Psihoyos is the only author who has registered a copyright in the image.  Mr. Psihoyos testified that he took all of the photographs used in the image (including all of the individual photographs of the monkeys), that he hired Mr. Varis as his assistant on the project, that he supervised Mr. Varis's work, and that Mr. Carroll had no role in creating the image itself.  (Nelson Dec. Ex. 34, Psihoyos Dep. at 36:8-39:18.)  Indeed, neither Mr. Varis nor Mr. Carroll has ever asserted ownership of the image.

In light of this evidence, Defendants' speculation that others were involved in the creation of the work or contributed to the article with which the work was first published is insufficient to create a triable issue of fact as to Mr. Psihoyos's ownership.  *See Western World Ins. Co.*, 922 F.2d at 121.

Concerning the "Iguanodon" photograph, Defendants argue (also for the first time) that the image lacks sufficient originality to warrant copyright protection because, Defendants argue, it is simply a direct photograph of an original sketch by Edward Drinker Cope located in the

Natural Museum of London.  To support this argument, Defendants state that, when they removed Mr. Psihoyos's photograph from publications subsequent to this lawsuit, they were able to replace it with an image that is "hardly distinguishable" from Psihoyos's image.  (Opp. at 17.)

Defendants are correct that there is authority for the proposition that photographs of two-dimensional public domain works of art that are no more than "slavish copying" of the original have been held not to warrant copyright protection.  *Bridgeman Art Library, Ltd. v. Corel Corp.*, 36 F. Supp. 2d 191, 196-97 (S.D.N.Y. 1999); *cf. L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 491 (2d Cir. 1976) ("[T]o support a copyright there must be at least some substantial variation, not merely a trivial variation such as might occur in the translation to a different medium.").  However, Defendants do not offer any evidence to support their contention that the image in question is, in fact, a mere "slavish copy" beyond their own assertion and the fact that they were able to obtain a similar image.  This is insufficient to defeat the presumption of copyrightability that arises from a valid registration.  *See Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) ("[P]ossession of a registration certificate creates a rebuttable presumption that the work in question is copyrightable.").  Further, Defendants also failed to plead an affirmative defense regarding the validity of Plaintiffs' copyrights.

In sum, the Court finds that there are no genuine disputes of material fact as to Plaintiffs' ownership of the copyrights in the four images at issue, and grants summary judgment for Plaintiffs on this issue.

### B.    Infringement of Exclusive Rights

There is no dispute that Defendants published copies of Plaintiffs' images without express permission.  A copyright holder possesses the exclusive right to "reproduce copyrighted

work in copies" and to "distribute copies . . . of the copyrighted work to the public by sale . . . ."
17 U.S.C. § 106.

However, if Defendants can show that the copying was authorized, or that they are
entitled to any other defense to copyright infringement, then they will not be held liable.
Defendants assert that they possessed an implied license to copy and publish Plaintiffs' images
before completing the process of obtaining and paying for an express license, and that Plaintiffs
are estopped from bringing a copyright claim for Defendants' allegedly infringing uses of the
images.

It is Defendants' burden to prove that they are entitled to these defenses, *Tasini v. New
York Times Co., Inc*., 206 F.3d 161, 171 (2d Cir. 2000), but on a motion for summary judgment it
remains the Plaintiffs' burden to show the absence of genuine issues of material fact that
Defendants will be unable to prove entitlement to the defenses.  *Giammettei*, 34 F.3d at 54.

### 1.      Implied License

#### a.      Applicable Law

Under section 204 of the Copyright Act, a grant of an exclusive license must be in
writing, but courts have held that "a nonexclusive license may be granted orally, or may even be
implied from conduct."  *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y.
1997) (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)).  In cases where the
existence of a license is in dispute, Defendants bear the burden of showing that there was a
license.  *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).[8]

The law in the area of implied licenses shows a measure of conflict.  Accordingly, a
careful review of the decisions in this area is warranted.

---

[8] In contrast, in cases where it is undisputed that there was a license, but the parties dispute the scope of that license,
it remains the plaintiff's burden to show that the defendant's use exceeded the license.  *Bourne*, 68 F.3d at 631.

A recent decision in this District outlined the traditional test for determining whether a copyright holder had conveyed an implied license by conduct, noting first that "the Second Circuit has not yet ruled on the precise circumstances under which an implied non-exclusive license will be found." *Weinstein Co. v. Smokewood Entm't Grp.*, *LLC*, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009). That decision explained that "our Circuit has followed the lead of other appeals courts and cautioned that implied non-exclusive licenses should be found only in narrow circumstances where one party created a work at the other's request and handed it over, intending that the other copy and distribute it." *Id.* (quoting *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc*., 211 F.3d 21, 25 (2d Cir. 2000) (internal quotation marks and brackets omitted) and citing *SHL Imaging, Inc. v. Artisan House, Inc*., 117 F. Supp. 2d 301, 317 (S.D.N.Y. 2000) ("An implied [non-exclusive] license can only exist where an author creates a copyrighted work with knowledge and intent that the work would be used by another for a specific purpose.")). The *Weinstein* decision ultimately concluded that the test for an implied license is strict, and such a license "will only be found when a copyright owner creates a work at the request of the licensee and with the intention that the licensee exploit it." *Weinstein*, 664 F. Supp. 2d at 344.

The test applied in *Weinstein* originated in the Ninth Circuit decision in *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990). There, the defendant filmmaker commissioned the plaintiff special effects company to produce a sequence of footage to be used in the defendant's finished movie. The defendant was not satisfied with the plaintiff's work and refused to pay the full fee that the parties had negotiated. However, he used the footage in the finished film anyway. The plaintiff sued for copyright infringement. The court held that, although the filmmaker may be liable for breach of contract, the plaintiff's conduct conveyed an

implied license for the filmmaker to use the footage in the film.  This was, in part, because the

plaintiff had "created a work at defendant's request and handed it over, intending that defendant

copy and distribute it."  *Id.* at 558.  The court was further guided by the fact that the defendant

had paid considerable money to plaintiff for the footage (albeit not the full, agreed-upon

amount), and that without a license to use the footage, the footage would be of "minimal value."

*Id.* at 559.  Thus, the court held, when the plaintiff handed over the footage, it was with the intent

that the defendant be permitted to use and distribute his work.  In so holding, the court expressly

declined to "construe payment in full as a condition precedent to implying a license."  *Id.* at 559

n.7.

The *Effects* approach has since been used in a variety of situations.  *See, e.g. Lulirama

Ltd. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 879-81 (5th Cir. 1997) (finding implied license

where writer created advertising jingles at request of defendant and with the intention that

defendant sell them to other parties); *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752-53 (11th

Cir. 1997) (finding implied license where composer created song at request of defendant, a

baseball team, and with the intention that defendant play it at games).

The test often appears in the context of architectural designs.  In these cases, an architect

is commissioned to draft plans at an early stage in a project, but at some point the architect is

dismissed and replaced.  When the customer uses elements of the architect's work in the finished

project, the architect sues for copyright infringement.  In *I.A.E., Inc. v. Shaver*, the Seventh

Circuit applied *Effects*, holding that courts should apply a three-part test to find that a

nonexclusive license has been granted when "(1) a person (the licensee) requests the creation of

a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee

who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his

work." 74 F.3d at 776.  In that case, the court found that the architect's creation of the drawings

at the request of the customer, along with evidence showing the architect's intent that they be

incorporated into the final project, was sufficient to convey an implied nonexclusive license to

use the drawings.  *Id.* at 776-78.  *But see Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998)

(holding that where agreement with architect contained "express provisions that [the architect]

would retain ownership of his drawings, and that those drawings would not be used for

completion of the [project] by others, except by written agreement with appropriate

compensation," there was no implied license to use the drawings).

Notwithstanding the "narrow" approach of the *Effects/Shaver* test, *Weinstein*, 664 F.

Supp. 2d at 344, courts in this Circuit and elsewhere routinely have relaxed the test to fit other

situations.  Some courts ignore the *Effects/Shaver* test entirely and instead focus on the oft-stated

principle that "consent given in the form of mere permission or lack of objection is also

equivalent to a nonexclusive license and is not required to be in writing."  *Keane*, 968 F. Supp. at

947 (quoting *Shaver*, 74 F.3d at 775).  *See, e.g., Field v. Google Inc*., 412 F. Supp. 2d 1106, 1115

(D. Nev. 2006) ("Consent to use the copyrighted work need not be manifested verbally and may

be inferred based on silence where the copyright holder knows of the use and encourages it.").

In *Field v. Google Inc.*, the District Court of Nevada held that an internet search engine

had an implied license to include works authored by the plaintiff in its databases of "cached"

webpages.  412 F. Supp. 2d at 1116.  The court based its decision on the fact that the plaintiff

was aware that a website author can prevent a search engine from storing "cached" versions of a

webpage by including particular instructions in the coding of its website (referred to in the

decision as a "no-archive meta-tag").  There was expert testimony in the record that the "no-

archive" meta-tag was an "industry standard mechanism" to prevent the caching of webpages.

*Id.* The court held that because the plaintiff had "knowledge of how Google would use the copyrighted works he placed on those pages, and [had] knowledge that he could prevent such use, [and] instead made a conscious decision to permit it," then "[h]is conduct [was] reasonably interpreted as the grant of a license to Google for that use." *Id*; *see also Parker v. Yahoo!, Inc.*, No. 07-2757, 2008 WL 4410095, at *3-4 (E.D. Pa. Sept. 25, 2008) (dismissing similar complaint by author against search engine based on reasoning in *Field*).

A court in this District similarly focused on a plaintiff's "knowledge of, and acquiescence" to a defendant's use of a software program designed by the plaintiff to find that the defendant had an implied license to use the software—at least until the plaintiff made his objection known. *Keane*, 968 F. Supp. at 947 (holding that knowledge of use, coupled with "silence in the face of [the defendant's] use" constitutes an implied license). Of note, in *Keane*, *Field*, and *Parker*, the courts all found implied licenses without adhering to the stricter requirements of the *Effects/Shaver* test. In particular, there was no argument in those cases that the plaintiff had created the work at issue at the request of the defendant, but the courts nevertheless found that an implied license had been created.

Even in decisions that purport to take the *Effects/Shaver* approach, courts have tended to skirt the "created at the licensee's request" prong, and focus instead on whether the putative licensor delivered the work with the intent that the licensee copy and distribute it. For example, in a recent decision in this District, the court denied the plaintiff's motion for summary judgment, holding that there was a genuine issue of fact as to whether a record label had an implied license to posthumously distribute previously unreleased recordings by the musician, Frank Zappa. *Zappa v. Rykodisc, Inc*., No. 08 Civ. 396, 2011 WL 3628897, at *9 (S.D.N.Y. Aug. 17, 2011). The court based its decision on the fact that the Zappa Family Trust "delivered

these tracks" to the defendant, and that Mr. Zappa's widow "cooperated in the album's release by drafting liner notes and designing the album's cover art." *Id.* The court did not address whether Mr. Zappa had originally created the works at the request of the defendant – and, in fact, it was clear that he had not done so. Nevertheless, the court held that the delivery of the recordings to the record label, and the participation in ancillary aspects of a potential release of those recordings, were sufficient to raise a genuine issue of fact as to whether there was an implied license.

The Ninth Circuit recently affirmed a decision by the District Court for the Central District of California in a case strikingly similar to the instant case. *See Falcon Enterprises, Inc. v. Publishers Service, Inc.*, No. 09-56468, 2011 WL 2356788 (9th Cir. June 15, 2011) ("*Falcon II*"). There, the plaintiff ("Falcon") was the owner of various "adult entertainment" images, which it periodically sent to the defendant ("Publishers") by physically mailing plastic sheets of "slides" or "chromes" containing the images. *See Falcon Enterprises, Inc. v. Publishers Service, Inc.*, No. Civ. 05-8304-GW, slip op. at 1-2 (C.D. Cal. July 17, 2009) ("*Falcon I*"). A notice was included with the sheets, stating that "[u]se is contingent upon written agreement with Falcon Foto." *Id.* at 3. Publishers would decide which, if any, of the images it wished to include in the magazines it published. Publishers would then send a purchase order to Falcon, setting forth which photos they wanted to publish and the price to be paid for each. Falcon would return a signed order, stating that permission was granted to publish the images in exchange for the designated fees. Actual payment for the usage was due "on publication." *Id.* at 4.

At some point, it came to the attention of Falcon that some of its images had been published without the parties having engaged in the process of securing permission and payment for those uses. Falcon sued for breach of contract and copyright infringement. After a bench

trial, the court entered judgment against Falcon with regard to the copyright infringement claims,

basing its decision on a finding that Publishers had an implied license to publish the photos.  The

court cited the *Effects* case, but did not analyze whether the images were created at the request of

Publishers.  Instead, the court focused on the parties' course of conduct with regard to the

delivery of the images:

> Here, it is not disputed that over the course of years of business, [Falcon] would
> send to [Publishers] sets of chromes from which [Publishers] would select images
> to publish in its magazines.  At no time had [Falcon] ever refused to grant a
> nonexclusive license for [Publishers] to publish the selected photographs upon
> [Publisher]'s request.  Moreover, pursuant to the parties' practices, the obligation
> to pay the license fee did not arise until after the publication had been issued.  In
> that situation, it is clear that [Falcon] granted to [Publishers] an implied license to
> publish any of the chromes which [Falcon] had sent to [Publishers] on that basis.

*Id.* at 11.

The district court held that Falcon had a viable breach of contract claim for failure to pay

the requisite licensing fees, but that the lack of payment did not negate the implied license.  The

court cited a decision from the Second Circuit explaining that "whether a licensee's purported

misconduct constitutes a copyright violation or a breach of contract depends 'on the distinction

in contract between a condition and a covenant.'"  *Id.* at 10 (quoting *Graham v. James*, 144 F.3d

229, 236 (2d Cir. 1998)).  If improper conduct constitutes a breach of a covenant, then the

plaintiff may maintain an action for breach of contract, but if the violation "consists of a failure

to satisfy a condition to the license . . . , it follows that the rights dependant [*sic*] upon

satisfaction of such condition have not been effectively licensed, and therefore, any use by the

licensee is without authority from the licensor and may therefore, constitute an infringement of

copyright."  *Graham*, 144 F.3d at 236-37 (citation omitted).  The *Graham* court held that the

failure to pay royalties and licensing fees constituted a breach of a covenant, not a condition.  *Id.*

32

In accordance with this decision, the district court in *Falcon I* held, the failure to pay did not defeat the implied license.

The Ninth Circuit affirmed the district court's decision. The court noted that "Falcon's claim that Publishers needed an express license for each image that Publishers published is contradicted by the frequent and informal interactions between the parties," including the fact that "Falcon never declined to give Publishers a nonexclusive license to publish its images" and the fact that "Publishers owed Falcon payment only after it published Falcon's copyrighted images." *Falcon II*, 2011 WL 2356788, at *1. Thus, the court concluded that "[t]he district court correctly characterized Publishers' failure to pay Falcon after publication as a contract breach . . . ." *Id.* Again, the court cited *Effects*, but did not address the requirement that Falcon have created the images at Publishers' request.

Some decisions, in applying *Effects*, have focused on the logic underlying the decision, particularly the fact that without a license to use the footage, it would have been of "minimal value." 908 F.2d at 559. The fact that the parties contemplated the payment of significant amounts of money for particular works speaks to their intent that a license to use that work be transferred. Thus, in a decision from this district, the court noted that in many of the cases finding an implied license, "if a license was not implied to permit the defendant's use of the copyright owner's work, the work would otherwise have been rendered worthless." *Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996). In *Design Options*, where the plaintiff sold to the defendant finished merchandise, as opposed to "a component of a larger work for the defendant's use in the larger work," "an implied license [was] in no way necessary to effectuate the purpose for which [the defendant] purchased the goods." *Id.* Thus, the court found that there was no implied license. *See also Holtzbrinck Pub. Holdings, L.P. v.*

*Vyne Communications, Inc.*, No. 97 Civ. 1082, 2000 WL 502860, at *4 (S.D.N.Y. Apr. 26, 2000) (holding that there was an implied license to use software code in a website because "the codes and files were intended for [the defendant's] use for the website.  Otherwise, the code would serve no function for [the defendant]," and the work would be "worthless").

Ultimately, whichever test is applied, the question comes down to whether there was a "meeting of the minds" between the parties to permit the particular usage at issue.  *Ulloa v. Universal Music and Video Distrib. Corp.*, 303 F. Supp. 2d 409, 416 (S.D.N.Y. 2004); *see also Design Options*, 940 F. Supp. at 92 (holding that there must be evidence that "*both parties* to the transaction, not just the defendant, intended that the defendant could use or copy the plaintiff's work without liability for copyright infringement"); *Viacom Intern. Inc. v. Fanzine Intern. Inc*., No. 98 Civ. 7448, 2000 WL 1854903, at *3 (S.D.N.Y. July 12, 2000) ("As with all copyright licenses, an implied license protects the licensee only to the extent the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used." (quotation marks omitted)).

### b.    Application of Law to Facts

Plaintiffs contend that there was no implied license, in the first instance, because the stricter *Effects/Shaver* test cannot be met, since there is no evidence that Plaintiffs created the works at Defendants' request.  As explained above, however, courts have routinely found an implied license even where this prong is not met.  *See, e.g., Keane*, 968 F. Supp. at 947; *Falcon II*, 2011 WL 2356788, at *1.

The record is clear that Plaintiffs did deliver the works to Defendants (via the Agencies) with the intent that Defendants copy and distribute them.  As in *Effects*, without a license to use the images in their publications, the images would be of "minimal value" to Defendants.  908

34

F.2d at 559.  The fact that Defendants did not prepay the requisite license fee is not dispositive, as courts have held that payment of a royalty is a breach of a covenant, not a condition, and therefore the failure to pay does not in itself negate the grant of an implied license.  *See id.* at 559 n.7; *Graham*, 144 F.3d at 236-37.

The problem here is that, as in *Falcon*, Defendants did not merely fail to pay royalty fees required by the license agreements; they failed to enter into the license agreements in the first place with respect to the images at issue.  *Falcon II*, 2011 WL 2356788, at *1.  The issue thus becomes whether the parties' conduct implied a grant of a license to Defendants even absent a license agreement as to those images.

It is important to define the precise contours of the license that Defendants are asserting was granted.  Defendants do not contend that they had an implied license to publish the images without *ever* paying Plaintiffs or securing a license.  Rather, Defendants contend that, based on the course of conduct between the parties, they had an implied license to publish Plaintiffs' photographs before they had completed the process of securing and paying for a license to publish the photographs, presumably so long as Defendants ultimately did secure such permission and pay the requisite fees.  (*See, e.g.,* Brenzel Dec. ¶ 4.)  Essentially, Defendants argue that there was an implied license for them to publish the works and then pay for their uses of Plaintiffs' works on a retroactive basis.[9]

Plaintiffs argue that a finding of an implied license in such circumstances amounts to a "forced license" of all of their works, and that Defendants' position asks the Court to rule that

---

[9] Accordingly, Plaintiffs' arguments that Pearson's efforts to obtain permission post-publication demonstrates Pearson's recognition that it did not have a license to use the images miss the mark.  (*See* Reply Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment ("Reply") at 1.)  Neither party is contending that Pearson had the right to use Plaintiffs' images without ever paying, or that it was not necessary ever to seek permission and pay a license fee.  Thus, the fact that Defendants later sought permission to use the images does not negate the possibility that Defendants had an implied license to use the image in the meantime.

contractual obligations "are meaningless and can be disregarded if the vendor ever previously backdated a license."  (Reply at 13.)  But this is not the case.  No party is forced to offer a license to use its works.  However, if the course of conduct between two parties demonstrates that there was a "meeting of the minds" that the practice of occasionally backdating licenses was permissible – in other words, if the plaintiff demonstrated "knowledge of, and acquiescence" to the practice of backdating licenses – then it is reasonable not to impose copyright infringement liability when a defendant engages in this practice.  *Keane*, 968 F. Supp. at 947.

### i.    Agency

The question whether there was a "meeting of the minds" to allow Defendants to use Plaintiffs' works raises an issue of agency.  The parties seem to agree that Plaintiffs did not directly grant any licenses—express or implied—to Pearson because Pearson dealt directly only with the Agencies.  The parties also agree that Science Faction served as Plaintiffs' agent throughout the time relevant to this case.  However, there is a potential issue as to whether Getty was in a position to grant a license to Plaintiffs' works—implied or otherwise—once the sub-agency relationship between Getty and Science Faction terminated in December 2008.  In other words, if "silence in the face of [Defendant's] use," *Keane*, 968 F. Supp. at 947, can create an implied license, *whose* silence can accomplish this?

Potentially, if Getty retained actual or apparent authority to offer licenses of Plaintiffs' works after December 2008, Defendants could argue that the "knowledge and acquiescence" of Getty alone gave rise to an implied license.  *Id.*  Indeed, Defendants repeatedly emphasize that they were never informed that Getty no longer had the right to license the images at issue until Pearson sought a license from Getty after the books containing those images had been published.  On the other hand, if Getty did not have any such authority, then Plaintiffs could argue that

Pearson's course of conduct with Getty is irrelevant to whether Defendants had an implied license.  (*See* Reply at 7 (citing *Country Rd. Music, Inc. v. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 328 (S.D.N.Y. 2003) (holding that there could be no implied license where defendant "neither commissioned nor received any works from plaintiffs themselves, and . . . obtained a license from parties who could not grant a reproduction right").)

The parties did not focus heavily on this issue in their briefs, and there is limited evidence in the record to resolve the question one way or the other.  Thus, the Court will not dwell on the issue except to note that the Second Circuit has held that "[t]he existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment."  *Minskoff v. Am. Exp. Travel Related Servs. Co., Inc.*, 98 F.3d 703, 708 (2d Cir. 1996).  In any event, genuine disputes of material fact preclude summary judgment on the respective Agencies' authority to grant licenses.  Thus, for purposes of this motion, the Court will consider the conduct of both Getty and Science Faction in determining whether a course of conduct gave rise to an implied license.

### ii.    Whether the Course of Conduct Implied a License

Plaintiffs argue that the evidence in the record shows that there are no genuine disputes of material fact precluding summary judgment that the course of conduct here did not give rise to an implied license.  Construing the evidence "in the light most favorable to the non moving party and drawing all reasonable inferences in [that party's] favor," as the Court must do on a motion for summary judgment, *Sledge*, 564 F.3d at 108, the Court finds that there are genuine issues of material fact that preclude summary judgment on this issue.

Both parties point to language in agreements between Defendants and the Agencies to support their positions.  However, the contracts do not in themselves resolve the issue.

Plaintiffs point in particular to the Image Storage Agreements, which contain the express admonition that "[t]here are no implied licenses to any of the Images."  (ISA at 1.)  Defendants argue that the Image Storage Agreement applied only to images obtained from the PAL.  Two of the four images at issue were used by Pearson's Curriculum group, which did not use the PAL, and therefore, Defendants argue, the Image Storage Agreement is not applicable to those photographs.  (Opp. at 21.)  Defendants also argue that looking at the language from the agreement in context makes clear that this provision only "means that inclusion of the image in PAL does not, of itself, give rise to an implied license."  (Opp. at 22.)

Ultimately, the Image Storage Agreement means less than what Plaintiff argues, and more than what Defendant argues.  Defendants are correct that the agreement governs only the use of the images in conjunction with the PAL.  And Defendants are also correct that the "no implied licenses" language appears in the context of the agreement providing that "Pearson acknowledges that no actual image reproduction rights, outside of inclusion on the PAL, are *granted by this agreement*." (ISA at 1 (emphasis added).)   But this does not mean that the Image Storage Agreement is not probative of the parties' overall relationship and course of conduct. On the contrary, the strict language of the Image Storage Agreement is compelling evidence of the parties' expectations regarding whether and how licenses to use the images are granted, including the need to "enter into a separate license agreement" to make any other use of the images, and the requirement of the "payment of license fees to Getty Images by Pearson in exchange for Pearson's right to reproduce and use the images." (*Id.*)  This language is relevant even if the contract does not actually mandate that there can be no implied licenses under any circumstances.

Defendants, in turn, focus on the Preferred Vendor Agreements, which provide for set prices for particular categories of images based upon the size of the image and the location in the publication.  As Defendants explain, because these decisions were not finalized until the end of the production cycle, the Preferred Vendor Agreements "arguably even required" permission to be secured late in the production process, if not after publication.  (Opp. at 4.)

As Plaintiffs point out, even Defendants' witnesses conceded that the Preferred Vendor Agreements themselves do not grant any actual license to use the images.  (*See* Reply at 11-12.) Further, the Preferred Vendor Agreements themselves provide that they are "executed pursuant to the terms of the License Agreement(s)" and state that they are not meant to "broaden the scope of the License Agreement(s)."  (PVA at 1.)  Those license agreements, in turn, provide that "[e]xcept as expressly stated in this Agreement," the agency grants to Pearson "no right or license, *express or implied*, to the Licensed Material."  (Getty License Agreement ¶ 3.1 (emphasis added).)  The license agreements also state that use of the licensed material in any manner not expressly authorized by the agreement "constitutes copyright infringement, entitling [the agency] to exercise all rights and remedies available to it . . ."  (*Id.* ¶ 10.1.)  And the agreements warn that "waiver of a right or remedy on any one occasion will not be construed as a bar to or waiver of rights or remedies on any other occasion."  (*Id.* ¶ 10.7.)  In any event, even if the Preferred Vendor Agreements did contemplate finalizing permissions towards the end of the production cycle, that does not explain why Pearson waited months—or even over a year— after publication to seek licenses for the images at issue in this case.

In short, although courts have held that contractual language can create or negate an implied license, *see, e.g., Johnson*, 149 F.3d at 500, neither the Image Storage Agreement nor the Preferred Vendor Agreements definitively establish whether or not an implied license arose in

this case.  Moreover, even if strict application of the contract language would preclude implied licenses to use the images, it is possible that there was a course of conduct between the parties that did create an implied license.  For example, if the contracts all said that there could be no implied licenses, and that permission to use the images did not begin until full payment was made, but the parties' actual practice was always to bill for the licenses a month after publication, there would potentially be a strong argument that the defendant had an implied license notwithstanding the contract language.  *See Falcon II*, 2011 WL 2356788, at *1 (looking at "frequent and informal interactions between the parties," and noting that "Falcon *never* declined to give Publishers a nonexclusive license to publish its images" (emphasis added));  *cf. Am Int'l, Inc. v. Graphic Mgmt. Assocs.*, 44 F.3d 572, 575 (7th Cir. 1995) (Posner, J.) (discussing situations in which it may be appropriate to examine "evidence that although [a] contract appears to be clear, anyone who understood the real-world context would know that it does not mean what it seems to mean").  *But cf. Metro Funding Corp. v. WestLB AG*, 10 Civ. 1382, 2010 WL 1050315, at *24 (S.D.N.Y. Mar. 19, 2010) (noting in U.C.C. context that "[w]hile prior course of dealings between parties is relevant in determining the meaning of an ambiguous contract, it is clear that, in New York, a course of dealing would not alter the express terms of a contract when, as here, the contract is not ambiguous." (quoting *Conte v. U.S. Alliance Fed. Credit Union*, 303 F. Supp. 2d 220, 230 (D.Conn. 2004)).  The problem here is that the evidence in the record is not clear on exactly what the parties' course of conduct actually was in this regard.

The parties each submit a variety of testimony and documents in to support their respective characterizations of the parties' course of conduct.  An exhaustive review of the evidence is not necessary to determine that there are genuine disputes of material fact that preclude summary judgment on this issue.

Defendants submit testimony that "[t]he relationship between Pearson Education, Inc. and representatives of Getty and Science Faction was such that Pearson Education, Inc. was permitted to placed [*sic*] images from those agencies in publications prior to sending an official request and receiving an invoice."  (Brenzel Dec. ¶ 4; *see also* Church Dec. Ex. E, Transcript of Deposition of Elaine Soares ("Soares Dep.") at 225:8-226:16 ("The basis for my understanding that there's an implied permission or that permission at one time was received is based on the fact[] that we have normal courses of doing business with the Vendors."); Church Dec. Ex. D, Transcript of Deposition of Pearson Education, Inc., Cynthia Vincenti ("Vincenti Dep.") at 98:5-10 ("Pearson would finalize paperwork after publication but there was always an understanding because of the relationship with the vendors that we can proceed with obtaining the image and placing it in a product.").)  Defendants also submit testimony from Pearson representatives stating that they attended meetings during which representatives from Getty were made aware of this practice, and at least tacitly approved of it.  (*See, e.g.*, Brenzel Dec. ¶¶ 7-8.)[10]

Plaintiffs submit testimony from Pearson witnesses that seems to suggest the opposite conclusion.  In particular, Plaintiffs point to testimony that printing photographs prior to obtaining approval was against Pearson's policies in place at the time.  (*See* Jolliffe Dep. 29:2-4 ("[T]he policy was that the license be obtained prior to publication.").)  Julie Orr, Permissions Manager for Pearson, testified that Pearson was not "going out and seeking permissions for something that's been done in the past" or attempting to obtain "retroactive rights" to use images.  (Orr Dep. at 121:23-25, 170:12-13.)  She explained that Pearson's right to publish the images does not begin until the issuance of the invoice from the creator or agency.  (*Id*. at 167:8-168:3.)

---

[10] There is scant evidence in the record as to whether Science Faction was aware of or approved this practice.

Defendants submit numerous examples of invoices where the Agencies appear to have granted a license retroactively for other photographers and artists.  (Church Dec. Exs. G and H.) In these invoices, the "invoice date" is, at times, months or even over a year after the "start date" listed on the invoice.  (*See id.*)

Plaintiffs point out that, although there appear to be some examples of Getty invoices demonstrating approval of this practice, Defendants submitted only two such examples from Science Faction.  (*See* Church Dec. Ex. H.)  Moreover, in one of those two examples, although the "invoice date" was after the "start date," the "order date" was prior to the "start date."  (*Id.*) Plaintiffs also submit numerous examples of Science Faction invoices to Pearson for works by Mr. Psihoyos where the "invoice date" is prior to or the same as (but never after) the "start date." (*See* Nelson Reply Dec. Exs. 50-74.)  Many of these invoices contain language that makes clear that permission to use the image is limited to what is stated in the invoice, and that any further usage requires permission in advance of such usage.  (*See id.* Exs. 53, 67, 70, 73 and 74.) Plaintiffs also point to correspondence from Pearson that makes similar assurances.  (*See* Nelson Reply Dec. Ex. 76 ("We will not use your pictures without requesting permission in advance and agreeing on a reuse fee.").)   In addition, Plaintiffs submit examples of correspondence from Getty specifying that the availability of the images "cannot be guaranteed until time of purchase."  (Nelson Dec. Ex. 8.)

In sum, the evidence in the record is, at best, inconclusive and contradictory.  Although the contracts appear to require that a license must be obtained before any use of an image is permissible, in practice, Pearson did at times publish images before finalizing permission. Further, it appears that the Agencies (or at least Getty) tacitly assented to this practice at times. But it is difficult to determine on the present record whether this retroactive billing was the

ordinary course of conduct between the parties, such that Plaintiffs (or their agents) could be said to have both "knowledge of" and "acquiescence" to this practice, or if these examples were aberrations from the norm. *Keane*, 968 F. Supp. at 947. And it remains impossible to rule as a matter of law whether, and to what extent, Getty and/or Science Faction stood in the shoes of the Plaintiffs for purposes of these inquiries.

Defendants may or may not be able to persuade a jury that the course of conduct here created an implied license. In either case, there is insufficient evidence in the record for the Court to resolve this question as a matter of law. Accordingly, summary judgment in favor of Plaintiffs as to Defendants' implied license defense is denied.

### 2.      Estoppel

For similar reasons, the Court denies summary judgment for Plaintiffs on Defendants' estoppel defense. Indeed, as Plaintiffs themselves state, the estoppel defense is "subsumed within the 'implied license' inquiry." (Reply at 2.)

To establish an estoppel defense in the copyright context, a defendant must show that:

> (1) plaintiff had knowledge of the defendant's infringing conduct; plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions suggesting authorization, or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment.

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 194 (S.D.N.Y. 2009) (quoting *DeCarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 497, 509 (S.D.N.Y. 2001)) (brackets omitted). Courts have warned that "[e]stoppel is a drastic remedy and must be utilized sparingly. Clearly, a successful application of this remedy requires the party asserting estoppel to use due care and not fail to inquire as to its rights where that would be the prudent course of conduct." *Keane*, 968 F. Supp at 948.

While there is little dispute that Plaintiffs did not have knowledge of the actual infringing uses of the four pictures at issue, there are genuine disputes of material fact as to whether Plaintiffs (or their agents) knew about and authorized (or failed to act to prevent) occasional retroactive post-publication licensing of their images in general.  There are also genuine disputes of fact as to whether, to the extent that Plaintiffs (and their agents) did not approve of this practice, Defendants were ignorant of this fact, and acted in reasonable reliance upon their assumptions.

It is  possible that on a fuller record, Defendants' estoppel defense will fail as a matter of law.  At the least, there is certainly reason to doubt whether Defendants "use[d] due care and [did] not fail to inquire as to [their] rights."  *Keane*, 968 F. Supp at 948.  However, granting Defendants, as the non-moving party, all reasonable inferences, the Court concludes that there are genuine issues of material fact that preclude summary judgment at this stage.

### C.      Willfullness

Because the Court has denied summary judgment on the issue of Defendants' liability for copyright infringement, the Court must also deny the motion for summary judgment on the issue of whether that alleged infringement was willful for purposes of 17 U.S.C. § 504(c)(2).

### V.      Discovery

There is one final issue that must be addressed with regard to the issue of Defendants' affirmative defenses.  Earlier in the litigation, Plaintiffs sought discovery of documents concerning Defendants' broader course of conduct, beyond the four specific images at issue in the case.  Defendants objected to discovery unrelated to the four images.  The parties brought the dispute to the Court, and the Court limited discovery to the documents related to the four images at issue.  (Dkt. No. 22.)

Plaintiffs now argue that Defendants' entire "course of dealing" argument must be stricken because Defendants have refused to allow discovery into their "broader dealings with Science Faction and Getty Images," and it would be "prejudicial to allow Defendants to cherry-pick evidence to support its course of dealing position." (Reply at 8 n.7.) Plaintiffs did raise this concern in their brief in support of their motion to reconsider the ruling limiting discovery to the four images at issue. (*See* Dkt. No. 28 at 9-10.)

At the time the Court ruled on this issue, it was not yet clear how central the implied license and course of conduct issues would ultimately become to the resolution of the case. Given the way that the parties' positions have developed over the course of the litigation, it may be necessary to re-open discovery in order to allow the parties to better develop the evidence on this issue. But this does not provide a basis for the Court to grant summary judgment to Plaintiffs at this time.

In addition, in their opposition, Defendants point to documents that were produced after the close of discovery that potentially show that Science Faction granted Pearson express licenses to use the "Tyrannosaurus" and "Storm" images, and they request additional discovery related to these documents pursuant to Federal Rule 56(f). (*See* Church Dec. ¶¶ 27-29; Exs. P, R.) Plaintiffs state that these licenses were granted through Getty's London office, and thus would have been granted to Pearson UK, an entity different from Defendant Pearson. (Reply at 1.)

The Court finds that these documents are ambiguous, and some discovery may be necessary to clarify their meaning and provenance.

**VI.     Conclusion**

For the foregoing reasons, Plaintiffs' motion for partial summary judgment (Dkt. No. 73) is GRANTED in part and DENIED in part.  The motion is granted as to Plaintiffs' ownership of the images at issue and as to their standing to bring this suit, but denied in all other respects.

The parties shall submit a joint letter to the Court no later than March 15, 2012 setting forth any additional discovery that may be necessary to prepare this case for trial in light of this Opinion.

SO ORDERED.

Dated:  New York, New York
        February 29, 2012

_____
J. PAUL OETKEN
United States District Judge