C4b9reec

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LOUIS PSIHOYOS,
JAMES P. REED,

                    Plaintiffs,

             v.                          10 CV 5912 (JPO)

PEARSON EDUCATION INC.,
R.R. DONNELLEY & SONS COMPANY
COURIER CORPORATION
FAILSAFE MEDIA COMPANY
BRADFORD & BIGELOW, INC.
LEHIGH PHOENIX,

                    Defendants.

------------------------------x

                                         New York, N.Y.
                                         April 11, 2012
                                         3:05 p.m.

Before:

                    HON. J. PAUL OETKEN

                                              District Judge

                         APPEARANCES

NELSON & McCULLOCH LLP
     Attorneys for Plaintiffs
BY:  DANIEL A. NELSON
         KEVIN PATRICK McCULLOCH

MORGAN, LEWIS & BOCKIUS LLP
     Attorney for Defendants
BY:  EZRA DODD CHURCH

C4b9reec

1          (In open court; case called)

2          THE DEPUTY CLERK:  Your Honor, this is in the matter

3     of Louis Psihoyos and James Reed v. Pearson Education, Inc., et

4     al.  This is docket number 10 CV 5912.

5          Again, can I have all counsel state their appearance,

6     please, for the record.

7          MR. McCULLOCH:  Kevin McCulloch, Nelson & McCulloch,

8     for plaintiff.

9          MR. NELSON:  Dan Nelson, Nelson & McCulloch, for

10     plaintiff.

11          MR. CHURCH:  Ezra Church for Pearson and the printer

12     defendants.

13          THE COURT:  Good afternoon everyone.

14          I have the parties' letters.  And let's tackle the

15     easy one first, which is the issue of whether there's any

16     express licenses as to two of the pictures, Tyrannosaurus Being

17     Cleaned, and Storm Researchers is the second one.

18          As to those two, there is a -- some suggestion in the

19     papers that there is an express license as to those perhaps

20     relating to the U.K. affiliate of Pearson.

21          Mr. Church, is there anymore information on that, in

22     terms of what you've located?

23          MR. CHURCH:  Your Honor, we don't have anymore

24     information on that.  I do think that -- what I can say is that

25     Pearson U.K. is a separate company.  They do their own

C4b9reec

1    permissioning.  We do know that.  And I think that if we are

2    able to confirm that these express licenses that were

3    referenced in the royalty statements were, in fact, from

4    Pearson U.K., I think there's probably no issue about which we

5    would need additional discovery because I think it would be

6    clear then that discovery wouldn't be relevant for this case,

7    it wouldn't be a defense for Pearson.

8         I think that we can dispose of that pretty quickly

9    just doing a reasonable search for documents within Pearson

10   Education, Inc.'s custody and control and then probably could

11   just stipulate with the plaintiffs that there is no need to

12   pursue discovery as to Pearson U.K.

13        THE COURT:  Okay.

14        MR. McCULLOCH:  Your Honor, we have absolutely

15   disagree.

16        If there is an express license to Pearson U.K.,

17   Pearson Education, Inc., can disavow that as a defense in this

18   case.  Fine.  As an express license defense.

19        However, if there is an express license to Pearson

20   U.K. and Pearson U.K. provided those images to Pearson

21   Education, Inc.; that also, even if there is no express license

22   to Pearson Education, Inc. and Pearson Education, Inc. agrees

23   that the express license to Pearson U.K. doesn't provide a

24   defense here, it does provide affirmative evidence that there

25   was no meeting of the minds with Getty Images.

C4b9reec

1        In addition, your Honor, Pearson Education U.K. is a

2    separate entity in a foreign country.  Getty Images provided

3    the photographs to Pearson Education U.K. through its foreign

4    delegate in Great Britain.  That's what's apparent on the

5    royalty statements.  GBR, Great Britain, is the sales

6    territory.  GBR is also the distribution territory.

7        If Pearson U.K. provided the images to Pearson

8    Education, Inc. that is a separate violation of copyright law,

9    17 U.S.C. 602, the violation of importation of copyrighted

10   material.

11       Pearson Education, Inc. has been a plaintiff in dozens

12   of actions to stop the importation of its copyrighted materials

13   from foreign sales at outlets to domestic sales outlets.

14       We absolutely, even if there is an express license,

15   need discovery as to the practice of sharing images of --

16   between foreign entities and domestic entities.  It will dispel

17   the notion that there is a meeting of the minds with Getty

18   Images, between Pearson Education and Getty Images, and it also

19   will give rise to a separate claim for violations of 602.

20       We are absolutely certain that this practice goes on.

21   We have other clients who have images that were purchased for

22   an express license by Pearson Education, Inc. and those images

23   were published by Pearson Canada in publications for years

24   without their knowledge.

25       That sort of conduct, exportation to foreign entities,

C4b9reec

1   is expressly set forth as a separate claim under 602(a)(1) and

2   (a)(2) and it's very clear that that gives rise to a separate

3   claim under 106 and 501, your Honor.

4           THE COURT:  Is that within the scope of the complaint

5   in this case?

6           MR. McCULLOCH:  The complaint is copyright

7   infringement related to these images.

8           THE COURT:  And this is one of the images that you're

9   claiming?

10          MR. McCULLOCH:  This is one of the images that we're

11  claiming.

12          And, your Honor, if it happens to give rise to a new

13  claim that's a separate issue, it certainly will be affirmative

14  evidence dispelling the notion that there's a meeting of the

15  minds between Getty Images and Pearson Education, Inc., a U.S.

16  corporation.  If the images were provided under an express

17  license, under a different licensing term two years earlier to

18  a foreign entity and Pearson U.K. e-mailed them or shared

19  systems or uploaded them to a system in the United States, that

20  circuitous route dispels the notion that there is some course

21  of dealing that let them use images and call Getty later.

22          That is something that we need discovery on because

23  it -- even if it gives rise to separate and additional claims

24  that aren't expressly pled, it certainly relates to the

25  defenses and the claims on the 501 claims that are at issue in

C4b9reec

1    this case.

2            THE COURT:  Do you want to respond to that?

3            MR. CHURCH:  Well it's somewhat a new theory to me.

4    And, frankly, it sounds like a fishing expedition.

5            I don't know -- it's a claim that's not alleged in the

6    complaint.  Frankly, I thought we had nailed down the fact that

7    these images were given to Pearson from Getty.  And if there's

8    some additional discovery that plaintiffs think they need on

9    that issue, we can certainly do that for Pearson Education,

10   Inc.  But I don't see any reason to reopen discovery just on

11   the chance that somehow there's this additional violation that

12   plaintiffs think might exist.

13           MR. McCULLOCH:  Your Honor, if I may?

14           THE COURT:  Yes.

15           MR. McCULLOCH:  I think your Honor's order made clear

16   how knowledgeable you are of the extensive record here.

17           How Pearson obtained these images has not been

18   resolved.  We have asked for -- every time Getty Images sends

19   an image to Pearson, it does it one of two ways:  A direct

20   upload to PAL under the bulk upload agreement; or on one-off

21   requests.  We asked for all transmission records or screen

22   shots from PAL.  There is one record in the Pearson asset

23   library and one transmission record.  We have no idea how the

24   other two images ended up in the hands of Pearson Education,

25   Inc.  They very well could have just downloaded them off the

C4b9reec

1    internet.  We have no idea.

2              The manner in which Pearson obtained the image -- the

3    images in this case is a central piece to their defense.  They

4    can't possibly claim there was a meeting of the minds with

5    Getty Images if they didn't obtain the images from Getty

6    Images.  They obtained from Pearson U.K. or downloaded them off

7    the internet or some other way, found them in a drawer.

8              The motion that it's a fishing expedition for new

9    claims is false.  We brought these issues to their attention to

10   try to ask them to withdraw what seemed to be a blatantly false

11   claim -- defense in this action.  They then submitted it to

12   your Honor in -- to the court in support of an express license

13   defense.

14             They have now put that issue in the case.  These are

15   now central questions about how they got the images and whether

16   or not they relate to their defenses.  We can't ignore the fact

17   that that's at issue now.

18             THE COURT:  I think that's right.  I think the method

19   by which Pearson, the defendant, obtained the images is

20   relevant.  And I think it's -- they do have to produce the

21   documents relating to that.

22             As a general matter, on the primary issue I do think

23   that a broader scope of additional discovery is required under

24   my decision and under -- I mean this is the result of asserting

25   and prevailing on summary judgment on the defense -- a defense

C4b9reec

1    like course of dealing, you know, implied license by course of

2    dealing.  You are going to have to produce -- defendant is

3    going to have to produce a larger group of documents, including

4    communications back and forth, really any communications back

5    and forth with Getty or Science Faction for the relevant time

6    periods that have any relevance to the dating issue, that is

7    the retroactive licensing or retroactive invoicing of not just

8    the images at issue but images that could establish a course of

9    conduct, which I think could be not only the plaintiffs' images

10   but other images that are part of that course of conduct with

11   the agents of the plaintiffs; that is Science Faction and

12   Getty.

13          So I do think you're going to have to do a broader

14   communications search.  The description of defendants' position

15   as to what should be produced on pages five and six of the

16   letter, the parties' letter, describes permission files for all

17   publications which include plaintiffs' images licensed by

18   Pearson through Getty or Science Faction; and (b), a report

19   from Pearson's Global Rights Data Warehouse reflecting the

20   bound book date for the Pearson Publications in which

21   plaintiffs' images were used.

22          And then there's a reference to targeted e-discovery

23   concerning communications with plaintiffs, Getty, and Science

24   Faction concerning the practice of backdating or retroactive or

25   late permissions.

C4b9reec

1    I certainly think that is the core of what is going to

2    be relevant is any references to the retroactive invoicing or

3    retroactive permissioning.

4    But given that the defense is a course of conduct

5    defense and you've succeeded in persuading me that there's a

6    genuine dispute of fact on that course of conduct defense,

7    either in the guise of implied license or estoppel, I do think

8    you're going to have to produce documents -- any documents that

9    would go to not just discussing the retroactive permissioning

10    but documents that evidence retroactive permissioning or not;

11    that is, you can't pick and choose the ones, you know, that you

12    think show retroactive permissioning but not produce the ones

13    that don't show it.  You really have to produce both so that

14    the jury can evaluate whether there was enough of the

15    retroactive practice to give rise to an actual course of

16    conduct that establishes the defense.  Beyond that, I don't

17    know exactly what categories of documents you would have and

18    how long it would take you to produce them.

19    But I do think -- do you have e-mails for the relevant

20    period of time?  Mr. Church?

21    Was most of this done by e-mail?

22    MR. CHURCH:  Pearson does -- did communicate quite a

23    bit with the agents via e-mail so we -- as we state in the

24    letter, we're certainly willing to work with plaintiffs on any

25    discovery plan that tries to get at the issues that your Honor

C4b9reec

1    set out in the order.

2            You know, our reaction was, to the plaintiffs' request

3    for discovery, in their own words, about the totality of the

4    deal as between Pearson and the agents.  They wanted all

5    communication -- their letter asks for all communications

6    between Pearson and Getty and Science Faction.  And they went

7    on with a long list of items that simply, you know, beyond what

8    we think is necessary under the Court's order and would be just

9    incredibly burdensome for Pearson to produce.

10           So, I guess to get back to your Honor's question, we

11   could do -- we could identify a group of custodians who had

12   communications with Getty and Science Faction.  I think the

13   parties already have most of those names.  And we could

14   certainly work on any discovery plan to get the communications

15   specifically about retroactive licensing, late permissionings

16   and backdating.

17           Your Honor also mentioned the concern about something

18   that doesn't just focus on the retroactive licensing but shows

19   where it wasn't taking place.

20           My suggestion there would be that -- one of the things

21   that Pearson does have the ability to do is to produce

22   fairly -- in a fairly efficient way, invoices.  And so what we

23   could do is, while not agreeing to give all invoices for the

24   last ten years between Pearson and Getty and Pearson and

25   Science Faction, that would be frankly hundreds of thousands,

C4b9reec

1    we could certainly do a sample for a year or six months that

2    the plaintiff identified, if the plaintiffs' counsel would

3    identify it.  We could give them those invoices so they could

4    look and say here's, you know, here's a certain percentage

5    where there was backdating, here's a certain percentage where

6    there wasn't.  So I think that's something we could certainly

7    do that would not be overly burdensome, that would kind of get

8    at this concern.

9              THE COURT:  Mr. McCulloch, do you want to address it.

10             MR. McCULLOCH:  Yes, your Honor.

11             Mr. Church claims that there are hundreds of thousands

12   of just invoices, not even e-mails, and that's obviously false.

13             Science Faction has been in business since late 2005.

14   There are, in our internal audit, less than two hundred total

15   licenses that Science Faction has granted.  And we think the

16   number is actually about 110 to Pearson.  Pearson has records

17   of all of those.  Pearson can produce all of those licenses and

18   it can produce a spreadsheet for all the books identified in

19   those licenses through the Global Rights Database Warehouse in

20   a matter of weeks.

21             So I don't see any reason why we would do any sampling

22   in terms of the Science Faction licenses given that the total

23   amount of paper that would change hands is going to be about

24   two hundred pages and it can happen in a week or two.

25             As for Getty Images, as your Honor pointed out, the

C4b9reec

1    concern isn't just invoices that reflect late permissioning.

2    It is invoices that don't reflect that.  And we need to be able

3    to establish whether or not the instances in which it occurred

4    are outliers or whether or not they reflect a true course of

5    dealing.  And we need to get at the permission requests

6    themselves, the e-mails themselves.  Because instances where

7    Getty backdates a license or grants a license after the fact,

8    we need no know why.  We need no know what was material -- what

9    was the material representation by Pearson, if any.  Was Getty

10   knowingly backdating a license or was it being duped in

11   thinking it was a forward license?  We need to know that.

12            Now in terms of sampling, I think we can come to some

13   agreement that Getty -- excuse me, Pearson should produce a

14   spreadsheet that GRDW report for all Mr. Psihoyos' and all

15   Mr. Reed's images that it obtained from Getty, how it obtained

16   those images and where it used them.  From that I think we can

17   identify an appropriate time period and then we can discuss

18   whether or not sampling is required.

19            We would disagree.  I don't think we're talking about

20   hundreds of thousands of invoices.

21            Pearson doesn't have that many books.  We're in the

22   midst of a class action in the Wu case dealing with print

23   overruns and they've identified about twelve hundred unique

24   title that were published by Pearson between 2000 and 2011.

25            If there's twelve hundred titles there can't be

C4b9reec

1    hundreds of thousands of invoices.  That's absurd.  Getty

2    Images and Pearson work on a very, very efficient basis.

3    There's a permission invoice request that's submitted and an

4    invoice that's submitted in response and it includes all of the

5    licenses on one single invoice.

6         So let's say there's 50 books produced in 2010.

7    There's probably only 50 invoices requesting 50 invoices.

8    There's not hundreds of invoices simply because there's

9    hundreds of photographers involved.

10        So I think Mr. Church's representation is a little

11   hyperbole.  And we certainly disagree that any sampling would

12   be necessary or appropriate for Science Faction.  And that --

13   we don't see it as appropriate for Getty Images just given the

14   limited nature of the books we're talking about here,

15   especially after we get the GRDW report.  We certainly should

16   be able to look at all of those invoices and all of those

17   communications when they deal with these specific pictures and

18   these specific plaintiffs in specific books.

19        As for the issue that Mr. Church said that we have

20   identified the appropriate custodians, we haven't in that case.

21   So that I would disagree with.  But Pearson doesn't do all of

22   its licensing in-house.  Pearson outsourced, as we explained in

23   our follow-up letter, the invoicing for these particular

24   publications to Datamatics.  We think that communications back

25   and forth, all the status memos, all the purpose of engaging

C4b9reec

1   Datamatics, those type of communications are absolutely

2   crucial.

3           Pearson's position is when we published these books,

4   we thought we had a license, we thought everything was fine.

5   We don't think that that's true as we made clear in our letter.

6           What happened is they published these books.  We,

7   Nelson & McCulloch, brought issues to Pearson's in-house

8   counsel's attention and attempted to negotiate a settlement.

9   The settlement talks fell apart.

10          That same summer Pearson Education, Inc. undertook a

11  massive audit of its curriculum at Pearson Education

12  curriculum.  That audit uncovered massive late permissioning

13  problems, unpermissioned images.  Then they engaged Datamatics

14  at that exact same time, August 2009, to do a cleanup effort.

15          Mr. Psihoyos got swept up in that effort.  License

16  requests went out to Getty Images.  And he wasn't at Getty

17  Images anymore.  So it got funneled to Science Faction.

18          All of the audit materials, how they learned that

19  these images were in these books without a license, all of

20  those background documents, the status memos with Datamatics;

21  all crucial, all go to the heart of this matter.  So we don't

22  agree it should be limited to invoices, it should be limited

23  just to the communications with Getty and Science Faction.

24          I'll also point out some of these images were not

25  originally at Getty.  They were at Matrix.  Matrix was

C4b9reec

1    Mr. Psihoyos' original agent.  When Matrix folded, then

2    Mr. Psihoyos went to Science Faction.

3              This is the centerpiece of the other case.

4    Mr. Psihoyos has dozens of direct licenses to Pearson, dozens

5    of licenses through Matrix.  And the -- then when Matrix folded

6    and he moved to Science Faction, this same type of problem

7    occurred.  And that's what's at issue in the Psihoyos two case.

8    That Pearson just kept reusing images even though they couldn't

9    find him, his prior agent.  And years later they figured out

10   his imagines had moved.  And then they contacted Science

11   Faction and it was years later.

12             That all is going to be relevant as well.  The course

13   of dealing with Mr. Psihoyos through direct licensing, and the

14   same with his other agents, Matrix; and he was at National

15   Geographic prior to Matrix, are all going to be relevant here

16   because the notion that they did this because of some meeting

17   of the minds with Getty, we can rebut that by saying you did it

18   with National Geographic, and you did it with Matrix, and you

19   had no meeting of the minds there, and this is just a pattern

20   and practice of misconduct.

21             So we would disagree that it should be limited to

22   invoices and certainly there shouldn't be a sampling of Science

23   Faction.

24             THE COURT:  Is all of that information related to

25   Datamatics, is that all being produced in the Wu case?

C4b9reec

1          MR. McCULLOCH:  Pearson has produced about 800 --

2     excuse me, that's the audit which we'll get into in a second.

3          There is a dispute in that case about what documents

4     are going to be produced.  Pearson has -- we've worked out, I

5     think, an agreement where Pearson has agreed to produce

6     communications from Datamatics back to Pearson, and Pearson's

7     internal communications about the Datamatics project, it's

8     engagement letter, status memos, etc.  So there is a set of

9     documents that's going to be produced in the Wu action and we

10    would just say produce those all here as well.

11         THE COURT:  Is that being handled by the magistrate

12    judge?

13         MR. McCULLOCH:  Magistrate Judge Francis in Wu 1.

14    Judge Francis is no longer overseeing discovery in Wu 2.  Judge

15    Forrest has taken that on herself.  And this same dispute has

16    arisen in the Wu 2 case.

17         THE COURT:  Are these both class actions?

18         MR. McCULLOCH:  One is a certified class.  One is a

19    pending class.  And we'll be moving for class certification

20    this summer right after the Scholastic action.

21         THE COURT:  Those are with the same counsel on both

22    sides?

23         MR. McCULLOCH:  Yes.

24         MR. NELSON:  No.  Scholastic has different counsel in

25    that case.

C4b9reec

```
 1          MR. McCULLOCH:  Wu 1 and Wu 2 have Morgan Lewis as

 2     counsel.  I do believe -- you can correct me if I'm wrong, that

 3     there's a different set of -- certain names are different in

 4     the case but the same litigation team generally.

 5          THE COURT:  Okay.  I mean I have to say generally I --

 6     as I said, I agree with plaintiffs that the -- with respect to

 7     generally with respect to asserting this defense of course of

 8     conduct you are going to have to produce a large set of

 9     documents.

10          Certainly any invoices -- well there's a couple of

11     concentric circles.  The first and most obvious set that will

12     be need to be produced is those documents relating to, whether

13     it's Science Faction or Getty or Pearson directly, any

14     documents relating to the plaintiffs, any of the plaintiffs'

15     images; those in this case as well as any other plaintiffs'

16     images.  Because those are going to be the most probative as to

17     a course of conduct because it would be Science Faction or

18     Getty insofar as they are clearly acting as the agent of

19     Mr. Psihoyos or Mr. Reed.

20          The second set would be other communications relating

21     to -- between Pearson and either Science Faction or Getty where

22     they might be representing other individual photographers or

23     copyright owners, but the course of conduct when dealing with

24     Science Faction or Getty is the same.  And whatever the agency

25     theory is, they're essentially giving defendants -- or in
```

C4b9reec

theory you may be giving defendants the same reason to believe

that they have an implied license or don't have an implied

license.  So that sort of thing would also need to be produced;

that is, invoices between Pearson and others represented by

Getty and Science Faction.  And any attendant related

communications that either discuss or reveal evidence of

retroactive permissioning, retroactive invoicing, or

prospective invoicing or permissioning, that is going either

way.

          I agree that all the Science Faction invoices will

need to be produced and any related communications that provide

any evidence of timing on these issues.

          As to Getty, because it's a longer period of time, the

most relevant; that is, those related to any of plaintiffs'

images, I think all of those invoices or communications will

need to be produced.  And the parties can try to work out an

agreement on whether some sampling as to a larger group, when

you have identified the relevant period of time -- I'd ask you

to try to meet an confer and reach some agreement as to whether

there's some kind of agreed-upon sampling period of time that

would be perhaps -- perhaps it's a week at various different

times or a month at various different years, if you could try

to meet and confer and reach an agreement on that, I think that

would be best.

          Is there any other specific -- I've given you general

C4b9reec

1    guidance that I'm hoping you can go back and work with.

2           Is there anything else that I need to address?

3           MR. McCULLOCH:  Yes, your Honor.  I mean you've laid

4    out I think four categories that are the central components of

5    discovery going forward.

6           But just to be clear we've asked for -- and I've made

7    that clear today -- the discovery related to Pearson -- the

8    relationship between Pearson U.K. and Pearson Education, Inc.

9    That, I think, relates to how they obtained the images.  If

10   they obtained them from Pearson U.K., we would need to know

11   that relationship, how images are shared, if there's a shared

12   server, were they e-mailed, etc.  So, that's one.

13          The other category is the Datamatics documents.  If we

14   just agree to produce them from the Wu action here, that seems

15   appropriate to me.

16          The third category that we would request are the --

17   what we've identified in our letter to your Honor as the

18   punitive fee settlement agreement discussions.  There are a

19   number of Getty Images, vendors and direct contributors, who

20   have brought claims against Pearson.  Even though they have

21   images -- same circumstance, have images, have Getty Images,

22   and they are pursuing their individual copyright claims.  And I

23   can laundry-list them for you, if you want.  But Science

24   Faction is a perfect example.  Science Faction's entire

25   collection is at Getty Images.  And Science Faction is pursuing

C4b9reec

1     independent claims in the Psihoyos v. Pearson 2 matter.

2              That is relevant because the notion that there was a

3     meeting of the minds to do this is dispelled by the fact that

4     Pearson is engaging and settling claims with other Getty Images

5     contributors for the exact same conduct, in fact, conduct --

6     some of them involving agents where Mr. Psihoyos has had images

7     in the past.  So we would ask that those types of

8     communications be disclosed and that those agreements be

9     produced in discovery.

10             The other cases that we've had, Wu 1 and Wu 2, this

11    has come up.  Mr. Church has agreed that there would be some --

12    the latest letter to Judge Francis, that they would agree to

13    produce what we would call the punitive fee category where

14    there is no formal settlement agreement with a photographer or

15    a direct contributor represented by counsel.  The contributor

16    finds out that this occurred, late permissioning.  They say I'm

17    not going to give you a license unless you pay a ten times

18    multiplier.  Pearson says fine, pays the multiplier.

19             There's, as we submitted to your Honor, entire

20    spreadsheets of Pearson tracking these type of punitive fee

21    retroactive licenses.  Those are relevant here and dispel this

22    type of notion that there has been this meeting of the minds

23    between the vendors whose images happen to be at Getty Images.

24    Then there's -- Pearson has agreed to produce those in Wu 1.

25    We would ask that they be produced here as well.

C4b9reec

1          The disputed category are where there are formal

2     settlement agreements for these types of claims.  Those -- we

3     also believe -- I don't see any relevant distinction between if

4     you pay a punitive fee and you get a retroactive license for a

5     vendor but they're not represented by counsel, as opposed to

6     they're represented by counsel and you pay some significant fee

7     and you settle the claims.  Those are all relevant to show the

8     course of conduct/implied license -- not only the course of

9     conduct/implied license, but, your Honor, they are absolutely

10    central to our willfulness claim.

11          And we've asked for them.  We've repeatedly asked for

12    them.  We've done an entire set of briefing to Judge Francis

13    and the issue is currently before him and he'll be handing down

14    his decision hopefully any day now on the formal settlement

15    agreements that should be produced.  We would ask your Honor to

16    consider those categories.  The Pearson U.K., Datamatics, the

17    audit materials, which are on a shared server.  They can be

18    produced quickly and they are going to be produced in Wu 1.

19    And then the punitive fee settlement category, those additional

20    categories.

21          MR. NELSON:  Can I add one issue to that, your Honor?

22          I'm concerned that we can miss the forest for the

23    trees here as well.  Both Mr. McCulloch and Mr. Church have

24    talked about a lot of practices with respect to particular

25    licenses.  But in the industry generally, almost all of these

C4b9reec

1    documents have restrictive language, and your Honor quoted some

2    of that in your opinion in this case, that say you can't do

3    this.  And Pearson's answer is essentially, for various

4    reasons, various of those agreements may not apply to these

5    particular images.

6            If there are high level communications between Pearson

7    and Getty Images, for example, about the bulk upload program,

8    about its preferred vendor agreement, about retroactive

9    licensing, those would obviously bear directly on the defense.

10   If Getty has sent an e-mail to Pearson saying you can't do

11   that, you can't use our images, or if Pearson has sent an

12   e-mail to Getty saying we get really busy sometimes making

13   books and sometimes we don't get a chance to come to you for

14   permission before we publish the books, is that all right with

15   you?  And they say don't worry about it, that's extremely

16   relevant to the defense involved here.  And I don't want to get

17   to such a detailed level of particular licenses that we miss

18   the communications between the CEO of Getty and the CEO of

19   Pearson saying:  Sorry, but our entire industry is based on you

20   telling us and asking us for permission prior to publishing

21   rights managed licensing so don't do that.  We'd like those

22   documents as well.

23           THE COURT:  Well I think that's fair.  I mean I think

24   if there are communications that go to, at a macro level, the

25   defense of the course of conduct, either supporting it or

C4b9reec

1    negating it, or shedding light on it, I think that would be

2    relevant.

3             MR. NELSON:  Or the absence of such documents, your

4    Honor, because that would tend to illustrate that this was made

5    up for litigation, that there was some understanding -- there

6    was no discussion about it and there was an admonition in every

7    license ever that you can't do it.

8             THE COURT:  Okay.

9             Mr. Church.

10            MR. CHURCH:  I mean as to the last point, I guess

11   generally, you know, Pearson is in agreement with your Honor

12   and with plaintiffs' counsel that we need to do some additional

13   discovery.

14            Our concern is that this could easily turn into a

15   several million dollar, you know, e-discovery bill, which is

16   not reasonable, is not warranted for this case, which is about

17   four images.  We've already done a year of discovery.  So our

18   concern is we have to find something that reasonable.  And

19   frankly that's what the rules entitle -- entitle Pearson to do.

20            So when I hear Mr. Nelson talk about how these

21   communications between people at Pearson and Getty are

22   relevant, you know, frankly, I think that's fine.  But I don't

23   know how we can get at those communications -- you know, he

24   talks about absence of discussion about limitations on these

25   licenses or retroactive licenses.  I don't know how we can get

C4b9reec

those in a reasonable way through e-discovery.  And so that's
our primary concern with this whole process is you can easily
run up a really onerous bill for discovery in a case about four
images, about four books.

          So we want to work with the plaintiffs and we want
to -- we agree with your Honor's decision that we need to do
some more, but we need to do it in a way that's reasonable and
that enables the parties to get through this discovery and have
a decision, you know, on the merits of the defenses.

          THE COURT:  Well, I understand.

          Electronic discovery can be expensive.  If you can --
but if you can find a way to do a smart searching you should be
able to do it.  There's also the possibility of if you know
something is going to be extremely costly, you could look at
the new -- not new anymore but the federal rule on e-discovery
and ESI and propose some sort of cost sharing arrangement, cost
shifting or something like that, if it's going to be extremely
onerous.

          But at the end of the day, your client has asserted a
course of conduct defense which requires, by its nature, a kind
of fairly broad examination into the parties' dealings and
communications which necessarily is going to entail looking at
a bunch of electronic documents.

          MR. CHURCH:  Certainly.

          To address some of the specific issues that they've

C4b9reec

 1   asked about, Pearson U.K. -- you know Pearson, what we can do

 2   is we'll go ahead and search for all documents relating to

 3   these express licenses.  We'll produce that.

 4        If plaintiff has some specific questions about the

 5   relationship between permissioning at Pearson Education, Inc.

 6   and Pearson U.K., I think the appropriate kind of vehicle for

 7   that would probably be some interrogatories that we could

 8   respond to and address this -- their thought that there may be

 9   some sharing.  My impression is that there would not be any

10   sharing of images between these two separate companies that do

11   their own permissioning.

12        THE COURT:  But I thought that you were agreeing that

13   there was as to this one image, no?

14        MR. CHURCH:  No.  I don't believe there was -- I mean

15   I think it helps to step back.  The royalty statements that the

16   plaintiffs produced do not indicate that Pearson U.K. is at

17   issue.  What they say is that the images were licensed in --

18   there's a shorthand GBR, which we think means Great Britain.

19   The suggestion that plaintiffs have made, and they've said they

20   actually have some reason to believe this, although they

21   haven't told us why, they think that that means Pearson U.K. is

22   the entity that licensed the image.  So that's the only reason

23   that Pearson U.K. has come up and they think Pearson U.K. might

24   be relevant.

25        I think what can he do is do discovery with respect to

C4b9reec

any express licenses for these images within Pearson Education,

Inc.  If they have some specific questions about the

relationship between PEI and Pearson U.K. I think we could

respond to some interrogatories on those issues, see where that

takes us.

THE COURT:  I think you should respond to

interrogatories.  I also think you need to search for any

communications or documents between Pearson and Pearson U.K.

about the images at issue, if they exist.

MR. CHURCH:  Certainly.  I think that -- and I had

envisioned that that would be included in the search that I was

discussing.

As to Datamatics, I don't think we have an objection

to producing documents that we're working on for the class

action in this case.

I would note that the plaintiffs already have

extensive information about Datamatics.  They took a deposition

in which the primary person who supervised Datamatics testified

extensively about their role and what they've done.

And plaintiffs have kind of a conspiracy theory about

why Datamatics was involved and what they did.  That's frankly,

false, I think.  But, you know, we can produce those documents

from the Wu case and hopefully that will clear up their

concerns about that issue.

THE COURT:  Yes.

C4b9reec

1            As to the Datamatics documents, and also the sort of

2    settlement documents, I'd like provisionally to go forward with

3    whatever protocols have been established in the Wu case so that

4    what Judge Francis decides with respect to settlements with

5    respect to Datamatics, or has decided, or Judge Forrest, I

6    would like that to be sort of presumptively how you -- the

7    approach you take here.

8            MR. CHURCH:  If I could on the settlement issue, your

9    Honor.

10           Wu is a class action.  So there's an argument there

11   that settlements with other agencies and other photographers

12   are relevant in that case.

13           Here we have a case where the course of dealing is,

14   according to plaintiffs, between Pearson and Louis -- and Louis

15   Psihoyos and Mr. Reed's agent Science Faction and Getty.

16           So I would respectfully submit that it would not be

17   appropriate to require Pearson to produce punitive fee

18   discussions with other agencies and other photographers in this

19   case where the course of dealing here is Science Faction and

20   Getty.

21           We have identified some discussions with Getty about

22   punitive fees.  We've already produced those.  We produced

23   those back before the case was assigned to your Honor.  If

24   there are any additional discussions between Pearson and Getty

25   about punitive fees, we'll produce those.

C4b9reec

                As to formal settlements, there are no formal

settlements between Pearson and Science Faction, between

Pearson and Getty, and so I think that issue is frankly off the

table.

                THE COURT:  Okay.

                Do you want to address that?

                MR. McCULLOCH:  Absolutely.

                Mr. Church's point is that they have produced whatever

documents that they have about punitive fees being paid or

settlements with Getty Images, and there just aren't any.  The

reason there aren't any is Getty Images doesn't own copyright

to any of the underlying images.  That's precisely why this

scenario arises, where images obtained through Getty Images

where there's a license violation the copyright owner brings

the claim.

                The point is that there are settlement and punitive

fees being paid to the copyright owners whose images are also

at Getty Images, the exact same scenario.

                If your Honor is saying you need to produce invoices

and communications that don't involve plaintiffs' images

because those invoices and communications bear on the course of

dealing, certainly where somebody says I'm not going to give

you a license, I'm going to charge you a punitive fee or I'm

going to get a lawyer and I'm going to sue you and you settle,

is just as probative as those instances where an invoice was

C4b9reec

1    granted or a party was duped and had no idea what was going on.

2         I will give a perfect example.  We represent a

3    photographer who has his images at Getty.  His images were

4    included in a book called China Science Explorer.  Pearson

5    failed to clear the permissions for the Chinese language

6    version of Science Explorer.  Years later, nine years later,

7    they went to clean it up and they wrote all the vendors a very

8    apologetic letter saying sorry, we forgot, we'd like to get an

9    invoice now.

10         Some of those vendors, just like here, were no longer

11   at Getty Images and Getty referred them to individual

12   photographers.  Individual photographers were livid and said

13   we're never going to give you a license for three hundred bucks

14   for a book that you published nine years ago.  That's copyright

15   infringement.  And Pearson started tracking entire spreadsheets

16   of punitive fees they were paying for those programs.

17         The communications that we're privy to -- there's only

18   a very small selection because we only represent a few

19   photographers who have images in those books -- are replete

20   with instances where Pearson said:  We are absolutely sorry.

21   We do not do business this way.  We understand that failing to

22   get permission at the time was a mistake.

23         Those are photographers in the exact same boat as

24   Mr. Psihoyos.  They had images at Getty Images.  Those images

25   left.  Getty Images ostensibly --

C4b9reec

1          THE COURT:  But if there were a jury trial -- we're

2     before a jury, we're talking about the four images at issue

3     here.  Wouldn't all that be prejudicial, all that stuff, under

4     403?  Why would I let in all this information about all these

5     other settlements where they goofed, where they said:  Oops I

6     have to pay these settlements.

7          You're going to say willfulness, right?

8          MR. McCULLOCH:  They go to dispelling the notion that

9     there was a meeting of the minds with Getty that you could use

10    images whenever you wanted and just call Getty Images up later

11    and it was fine.  Not, as your Honor pointed out in your order,

12    the question isn't going to just end at Getty Images because

13    Getty had acknowledged it didn't represent these photos and

14    couldn't give the licenses.

15          So the question is now about apparent authority and

16    agency and how you deal with those instances where images have

17    moved.  These are the only substantially similar circumstances.

18          In addition, it goes to willfulness.  And courts have

19    allowed in settlement documents prior bad acts, instances in

20    which a party has agreed to punitive fees because it bears on

21    knowledge and the inference of constructive knowledge.  And

22    I'll go one better for you.  The question of how much Getty --

23    how much Pearson paid for retroactive late licenses goes

24    directly to the damages question for lost license fees.

25          Now the reason is how much you pay for a prospective

C4b9reec

```
1    license is a certain data point on a scale.  How much you pay

2    for a retroactive license point is a different data point on

3    the same scale.  Copyright cases haven't dealt with this very

4    extensively because this type of stuff just doesn't happen.

5    They don't grant retroactive licenses for rights managed

6    photography.  But they do in the patent context.  And those

7    cases make absolutely clear that settlements and punitive fees

8    paid for retroactive uses in the patent context establish the

9    baseline for lost license fees -- lost royalties in that

10   context, here lost license fees.  That case law is absolutely

11   clear across all jurisdictions, especially here in the Southern

12   District, that prior bad acts, prior settlements, punitive fees

13   paid establishes a data point for determining how a damages

14   expert would calculate lost license fees.

15           So not only does it go to dispel the defenses.  It

16   goes to the question of willfulness.  And even if we don't have

17   statutory damages, it will go to the question of actual

18   damages, the lost license fee, because how much Getty -- or how

19   much Pearson is paying in the context of retroactive licenses

20   is going to be a data point that our experts are going to

21   testify to.

22           THE COURT:  And you're producing the information in

23   the Wu case; is that right, Mr. Church?

24           MR. CHURCH:  We are -- we are -- we have agreed to

25   produce -- not formal settlements.  That's an issue that --
```

C4b9reec

1          THE COURT:  Right.

2          MR. CHURCH:  -- Judge Francis is taking up.  We have

3     agreed to produce some invoices or invoices that we've

4     identified, communications that we've identified about these

5     punitive fees.

6          THE COURT:  Well whatever you produce in that case I'm

7     going to let you produce in this case.  That doesn't decide

8     whether it's going to be admissible in this case.

9          I have to -- there's going to be another matter in

10    this courtroom with another judge at 4:00 so I'm going to have

11    to wrap up.

12         I think -- I think at least in general terms you need

13    to go back and do a fair amount more discovery.

14         How much time do you think you need?  Is three months

15    enough?

16         MR. CHURCH:  Your Honor, frankly if we're going to do

17    some additional e-discovery, it might take -- it might take

18    longer than that.  The plaintiffs have also indicated they'd

19    like to take some third party depositions.  That will take some

20    time.

21         MR. McCULLOCH:  I'll note, your Honor, we've asked

22    Pearson about this.  And I think it's referenced in a footnote

23    in their submission.  Assuming that certain materials are not

24    available to Pearson Education, Inc. we may need to conduct

25    third party discovery on Pearson U.K. which would require

C4b9reec

1    service of a subpoena through the Hague Convention.  That's

2    just a burdensome, time-consuming process.  And we referred

3    that -- we asked about that, whether or not they do share

4    materials and are going to be able to produce it without third

5    party subpoenas.  Mr. Church said they're not sure.  So we

6    would just request that the time period for discovery take into

7    account not just the e-discovery that's going to be required

8    but also third party discovery of Getty Images and the

9    possibility of third party discovery of Pearson Education --

10   Pearson U.K.

11           THE COURT:  Okay.  Why don't we schedule a follow-up

12   conference in early August -- either late July or early August.

13   But I think we just scheduled a trial in late July.

14           We can either do July 31, August 1, August 2.

15           Are you all going to be around?

16           MR. McCULLOCH:  I get married on August 18.  So the

17   sooner the better for me.

18           THE COURT:  Congratulations.

19           MR. McCULLOCH:  I have some commitments beginning

20   August 10.  So July 31 or August 1 are preferable to me, and

21   further in August is not.

22           MR. NELSON:  My law partner is getting married in

23   August, so I'm --

24           THE COURT:  Mr. Church.

25           MR. CHURCH:  Off the top of my head, those sound fine.

C4b9reec

1    My BlackBerry, of course, was confiscated.

2              THE COURT:  Right.  August 1.  2:00 p.m.

3              MR. McCULLOCH:  Perfect.

4              MR. CHURCH:  Thank you, your Honor.

5              THE COURT:  Thank you.

6              MR. NELSON:  Thank you, your Honor.

7              THE COURT:  See you then.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25