UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUIS PSIHOYOS and JAMES P. REED, | Case No. 10-cv-5912 (JPO) |
| *Plaintiffs*, | Hon. J. Paul Oetken |
| v. | **ECF CASE** |
| PEARSON EDUCATION, INC.; R.R. DONNELLEY & SONS COMPANY; COURIER CORPORATION; and FAILSAFE MEDIA COMPANY, | |
| *Defendants*. | |

## <u>RENEWED MOTION FOR SANCTIONS UNDER RULE 11</u>

Danial A. Nelson (DN4940)
Kevin P. McCulloch (KM0530)
NELSON & McCULLOCH LLP
The Chrysler Building
405 Lexington Ave., 26th Floor
New York, N.Y 10174
T: (212) 907-6677
F: (646) 308-1178

DATED:  October 10, 2012                    *Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

PROCEDURAL BACKGROUND.........................................................................................3

SUMMARY OF ARGUMENT ............................................................................................. 7

ARGUMENT ...................................................................................................................... 8

I.      APPLICABLE STANDARD FOR IMPOSING SANCTIONS UNDER
       FRCP 11........................................................................................................... 8

II.     DEFENDANTS' IMPLIED LICENSE DEFENSE IS FRIVOLOUS............................. 10

      A.     Standard For Establishing Implied License. ........................................ 10

      B.     The Factual Record Discredits Defendants' Implied License
           Defense. ............................................................................................ 11

      C.     Pearson's Agreements With Getty Preclude An Implied License
           Defense. ............................................................................................ 15

      D.     Both The Substance And Timing Of Pearson's Permission
           Requests Discredit Its Implied License Claim..................................... 18

      E.     Pearson's Preferred Vendor Discount Pricing Agreements Do Not
           Create An Implied License. ................................................................ 21

      F.     Pearson's Image Storage Agreement with Getty Images Precludes
           An Implied License Defense............................................................... 23

      G.     Pearson's Settlements With Getty Images Discredits Defendant's
           Position. ............................................................................................ 24

III.    SANCTIONS ARE WARRANTED.......................................................................... 25

CONLCUSION................................................................................................................... 26

# TABLE OF AUTHORITIES

## CASES

*Business Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533 (1991)..................................................................................... 8

*Cal. Architectural Bldg. Prods. v. Franciscan Ceramics*, 818 F.2d 1466 (9th Cir. 1987)....................................................................... 9

*Country Road Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325 (S.D.N.Y. 2003)................................................................................ 10

*Cross & Cross Properties v. Everett Allied Co.*, 886 F.2d 497 (2d Cir. 1989)........................................................................................... 9

*Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86 (S.D.N.Y. 1996)................................................................................ 10

*Eastway Constr. Corp. v. City of New York*, 762 F.2d 243 (2d Cir. 1985)............................................................................................... 9

*Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, (9th Cir. 1990) ................... 10

*Gutierrez v. Fox*, 141 F.3d 425 (2d Cir. 1998) .......................................... 8

*O'Brien v. Alexander*, 101 F.3d 1479 (2d Cir. 1996) ................................ 9

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986)................................... 9

*Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103 (S.D.N.Y. 2012) ................................................................................... 6, 10, 21

*SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301 (S.D.N.Y. 2000)........................................................................... 10, 18

*Simon DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc.*, 186 F.3d 157 (2d Cir. 1999) ......................................................... 9

*Ted Lapidus, S.A. v. Vann*, 112 F.3d 91 (2d Cir. 1997)............................. 9

*Ulloa v. Universal Music & Video Distribution Corp.*, 303 F. Supp. 2d 409 (S.D.N.Y. 2004)................................................ 10, 18

*Viacom Int'l, Inc. v. Fanzine Int'l, Inc.*, No. No. 98-cv3448, 2000 WL 1854903 (S.D.N.Y. July 12, 2000) ......................................... 18

*Wechsler v. Hunt Health Systems, Ltd.*, 216 F. Supp. 2d 347 (S.D.N.Y. 2002)................................................................................... 9

**OTHER AUTHORITIES**

3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 10.03[A] (1989)...................................... 10

**FEDERAL STATUTES AND RULES**

17 U.S.C. § 602......................................................................................................................... 12

Plaintiffs Louis Psihoyos and James Reed ("Plaintiffs"), by and through undersigned counsel, hereby move the Court under Rule 11 of the Federal Rules of Civil Procedure ("FRCP") for sanctions against Defendants and their counsel for pleading and maintaining frivolous defenses that Defendants and their counsel know have no factual basis or evidentiary support.

## INTRODUCTION

Plaintiffs are professional photographers who license their images through licensing agents, including Science Faction. Science Faction, in turn, licensed images through various subagents, including Getty Images. Plaintiffs allege that Defendants infringed their copyrights by publishing four photos without a license. Defendants deny these claims, contending that Pearson's purported "course of dealing" with Getty Images created an "implied license" allowing Pearson to publish these (or any) photos in these (or any) publications and products without purchasing the necessary license in advance.[1]

Because this defense has no support in the evidentiary record, Plaintiffs previously served a Motion for Sanctions on Defendants on July 26, 2011. *See* McCulloch Decl. Ex. 1. As required under FRCP 11, Plaintiffs allowed Defendants 21 days to withdraw their frivolous defenses before seeking to file the motion. After Defendants declined to avail themselves of this opportunity, Plaintiffs sought leave to file the motion, as required under Judge Rakoff's Individual Practices, during a telephone conference with the Court. *Id.* ¶ 4. Judge Rakoff denied the request on procedural grounds and Plaintiffs were not permitted to file their motion. *Id.*

Now, after another year of extensive motions practice and discovery, Defendants still

---

[1] Although Defendants contend that they obtained valid permission from Getty Images to use these photographs, it is not surprising that Defendants have not sought indemnification from or asserted any claims against Getty Images. In fact, Defendants also have not requested any discovery from Getty Images or Science Faction, and Defendants' counsel has threatened to seek sanctions against Plaintiffs' counsel for serving a document subpoena on Getty Images.

have not produced any evidence supporting their defenses.  Although Defendants previously argued that Pearson had purchased an "express license" from Getty Images pertaining to two of Plaintiffs' photos, Defendants' counsel now acknowledges that there is no evidence to support that argument and concedes that Pearson never purchased a license to use these photos.

Defendants also have failed to show any factual basis for their "implied license" defense, which requires that Defendants prove that Getty and Pearson reached a "meeting of the minds" that Pearson was permitted to publish Plaintiffs' photos without purchasing the necessary license.  The lack of support for Defendants' position is hardly surprising given that the record shows that Pearson did not corresponded with Getty regarding these photos in any way prior to publication, including even to advise Getty that it intended to publish Plaintiffs' photos in these books.  Rather, the first time that Getty learned that Pearson *intended* to publish Plaintiffs' photos was when Pearson first contacted Getty Images to *request* a license.  That correspondence was misleading, of course, since Pearson already had published the books *months or years earlier*.  In each case, Pearson's correspondence demonstrates that it did not believe that it already had permission from Getty Images for the uses it already had made of the photos.

Although this evidence alone is sufficient to discredit Defendants' implied license defense, the record is even more conclusive.  In particular, recent documents subpoenaed from Getty Images demonstrate that—as Pearson and its counsel have known or should have known all along—Pearson did not even obtain two of the images from Getty Images, at least not directly and thus Getty did not even know that Pearson was in possession of those photos.   If Getty did not know that Pearson even had the images, it could not have granted Pearson a license—implied or otherwise—to publish them.  Getty also produced documents showing that all images obtained by Pearson (including Plaintiffs' images downloaded by Pearson directly, as well as images

Case 1:10-cv-05912-JPO   Document 120   Filed 11/05/12   Page 7 of 31

acquired by third parties and then improperly transmitted to Pearson) were obtained subject to agreements that expressly precluded any publication of the photos without the purchase of a separate license.  Defendants and their counsel either have been aware of this evidence since the inception of this suit and improperly withheld it, or they failed to conduct the proper inquiry before pleading their defenses.  In either case, sanctions under FRCP 11 are warranted.

## PROCEDURAL BACKGROUND

Plaintiffs filed this action on August 5, 2010, alleging that Pearson infringed their copyrights in four photographs.  (Dkt. No. 1.)  Pearson filed its Answer on December 14, 2010. (Dkt. No. 25.)  Pearson's Answer included numerous "Additional Defenses," most of which included no factual allegations or explanation.  (*Id.* at 6.)  For instance, Pearson's "Seventh Additional Defense" alleged, in its entirety, "Plaintiffs' claims are barred, in whole or in part, by agreements between Pearson and third-party agencies."  Pearson did not identify the alleged "agreements" that supposedly barred Plaintiffs' claims or the alleged "third-party agencies." Pearson's "Eighth Additional Defense" alleged, in its entirety, "[t]he actions Plaintiffs complain of, if true, would constitute at most breach of contract and not copyright infringement."  (*Id.*) Again, Pearson did not identify the alleged "contract(s)" that it contends were involved, nor did it identify the parties to the alleged contract(s) or what provision of the mysterious contract(s) would "bar" Plaintiffs' copyright claims.  Pearson was unable to plead any facts to support these defenses as there are no "contracts" or "agreements" that "bar" Plaintiffs' claims.

Plaintiffs subsequently filed an amended complaint joining additional defendants (the "Printer Defendants") that Pearson identified as having published the publications at issue.  (Dkt. No. 31.)  Pearson answered the amended complaint on January 10, 2011.  (Dkt. No. 32.)  On January 19, 2011, Plaintiffs filed their Second Amended Complaint, adding a request for a

acquired by third parties and then improperly transmitted to Pearson) were obtained subject to agreements that expressly precluded any publication of the photos without the purchase of a separate license.  Defendants and their counsel either have been aware of this evidence since the inception of this suit and improperly withheld it, or they failed to conduct the proper inquiry before pleading their defenses.  In either case, sanctions under FRCP 11 are warranted.

## PROCEDURAL BACKGROUND

Plaintiffs filed this action on August 5, 2010, alleging that Pearson infringed their copyrights in four photographs.  (Dkt. No. 1.)  Pearson filed its Answer on December 14, 2010. (Dkt. No. 25.)  Pearson's Answer included numerous "Additional Defenses," most of which included no factual allegations or explanation.  (*Id.* at 6.)  For instance, Pearson's "Seventh Additional Defense" alleged, in its entirety, "Plaintiffs' claims are barred, in whole or in part, by agreements between Pearson and third-party agencies."  Pearson did not identify the alleged "agreements" that supposedly barred Plaintiffs' claims or the alleged "third-party agencies." Pearson's "Eighth Additional Defense" alleged, in its entirety, "[t]he actions Plaintiffs complain of, if true, would constitute at most breach of contract and not copyright infringement."  (*Id.*) Again, Pearson did not identify the alleged "contract(s)" that it contends were involved, nor did it identify the parties to the alleged contract(s) or what provision of the mysterious contract(s) would "bar" Plaintiffs' copyright claims.  Pearson was unable to plead any facts to support these defenses as there are no "contracts" or "agreements" that "bar" Plaintiffs' claims.

Plaintiffs subsequently filed an amended complaint joining additional defendants (the "Printer Defendants") that Pearson identified as having published the publications at issue.  (Dkt. No. 31.)  Pearson answered the amended complaint on January 10, 2011.  (Dkt. No. 32.)  On January 19, 2011, Plaintiffs filed their Second Amended Complaint, adding a request for a

declaration of Plaintiffs' rights to know the uses that Pearson was and is making of their creative works.  (Dkt. No. 39.)  Pearson answered the Second Amended Complaint on February 7, 2011.  (Dkt. No. 44.)  The Printer Defendants, however, did not answer the allegations against them.

During a telephone conference on February 9, 2011, the Court held that the Printer Defendants were in default and ordered them to answer within one week.   The Printer Defendants filed their answers on February 16, 2011.  (Dkt. Nos. 46, 48, 50, 52, & 54.)  Like Pearson, each of the Printer Defendants asserted a number of bare bones "Additional Defenses" that included no factual allegations or support.

On March 2, 2011, counsel for the parties met and conferred regarding the sufficiency of Defendants' pleadings, at which time Plaintiffs' counsel advised that Defendants' pleadings were deficient because they "lack basis under Rule 11, cannot prevail on any possible basis, . . . and fail to comply with Rule 8."  Nelson Decl. Ex. 13.  When Defendants refused to amend their answers or withdraw their baseless defenses, Plaintiffs filed a motion under Rule 12(f) to strike Defendants' pleadings.  (Dkt. Nos. 57-59.)   Defendants did not oppose Plaintiffs' motion.  Instead, all Defendants filed Amended Answers.  (Dkt. Nos. 60-65.)

Although Defendants' Amended Answers included more factual allegations, they continued to plead several frivolous defenses.  For instance, each Defendant alleged a "Statute of Limitations" defense based not on the date Plaintiffs discovered Pearson's infringing conduct, nor even based on the date of publication of the infringing publication.  Instead, Defendants each alleged that "Plaintiffs have known or had reason to know for many years that permission-related documents might be completed after publication of their images," and that "Plaintiff Psihoyos was aware of the practice of so-called 'retroactive permissioning' for at least 6 years before filing suit."  (*E.g.*, Dkt. No. 65 at 23, ¶¶186-87.)

4

Once again, Plaintiffs advised Defendants that these defenses were frivolous.  Plaintiffs specifically advised Defendants that their "Statute of Limitations" defense had no basis in the law, and that their "Implied License" and "Breach of Contract not Copyright Infringement" and "Agreements Between Pearson and Plaintiffs' Agents" defenses lacked a factual basis.  Nelson Decl. Ex. 14.  Defendants' counsel ignored the issue for weeks, forcing Plaintiffs' counsel to repeatedly raise the issue.  *Id.* Exs. 15 & 16.  Finally, on May 2, 2011, Defendants relented and filed Second Amended Answers.  (Dkt. Nos. 66-71.)  Defendants amended their pleadings to withdraw their frivolous "Statute of Limitations" defense but, incredibly, they chose not to withdraw their other three frivolous defenses.  (*See* Dkt. Nos. 67, 68, 70 & 71).

On May 12, 2011, Plaintiffs once again advised Defendants that these defenses had no basis in law or fact, and again requested that Defendants withdraw them.  Nelson Decl. Ex. 17.  Defendants ignored this correspondence.  On July 1, 2011, following additional discovery and deposition testimony confirming that these defenses lacked merit, Plaintiffs again advised Defendants' counsel that these defenses have no basis in law or fact, and once again requested that Defendants withdraw them.  Nelson Decl. Ex. 18.  On July 11, 2011, Plaintiffs' counsel provided an extensive summary of documents demonstrating that these defenses lacked merit and advised Defendants and their counsel that Plaintiffs intended to seek sanctions.  *Id.* Ex. 19.

Because Defendants refused to withdraw their defenses, Plaintiffs served on Defendants and their counsel a motion for sanctions under FRCP 11 on July 26, 2011.  *See* McCulloch Decl. Ex. 1.  As required under FRCP 11, Plaintiffs allowed Defendants 21 days to withdraw the challenged pleadings.  After Defendants failed to withdraw or disavow the challenged defenses, Plaintiffs sought leave from the Court to file their motion, as required under Judge Rakoff's Individual Practices.  *Id.* ¶ 4.  Judge Rakoff, however, denied Plaintiffs' request on improper

procedural grounds and thus Plaintiffs were not permitted to file their motion.[2]  *Id.*

As a result, the parties were forced to conduct full briefing on cross motions for summary judgment.  Shockingly, Defendants argued on summary judgment not only that Pearson had an "implied license" to use Plaintiffs' photos, but also asserted a new defense that "Pearson paid . . . for an **express license** to use" two of the photos in suit.  (Def. Mem. in Opp. at 15 (emphasis added).)   The only evidence offered in support of this frivolous argument were royalty statements issued by Science Faction to Plaintiffs showing payments related to licenses for two of the photos at issue.  (*See* Decl. of Ezra Church, Exs. P & R.)  These documents, however, did not identify Pearson as the licensee, nor did they suggest that the licenses related to the publications at issue in this case.  On the contrary, these documents plainly stated that the underlying licenses had been issued in "GBR" (Great Britain) for use only in "GBR."  *Id.*  Thus, on their face, these documents discredited the argument that Pearson Education, Inc.—as opposed to Pearson Education Ltd. (Oxford) ("Pearson UK")—had purchased a license.  Defendants' counsel was aware that this "express license" argument was frivolous prior to filing.

Before briefing was completed, this case was transferred to Judge Oetken, who subsequently ruled on the parties' summary judgment motions.  (Dkt. No. 99.)  The Court found that "the evidence in the record is, at best, inconclusive and contradictory" and thus denied summary judgment and ordered additional discovery regarding Defendants' "implied license" defense.  *See Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 128 (S.D.N.Y. 2012).

---

[2] Confusingly, Judge Rakoff denied Plaintiffs leave to file their motion because the parties had not yet filed motions for summary judgment, and thus the Court had not yet ruled on the merits of the challenged defenses.  According to Judge Rakoff, a motion for sanctions under FRCP 11 must be filed <u>after</u> the Court addressed the merits of the defenses on a dispositive motion.  Judge Rakoff's ruling directly contradicts settled law.  *See Langdon v. County of Columbia*, 321 F. Supp. 2d 481, 484-85 (N.D.N.Y. 2004).  Given that striking the frivolous defense is one of the sanctions under FRCP 11, it makes no sense to require the parties to brief dispositive motions <u>before</u> challenging the same defenses under FRCP 11.

Since March 15, 2012, the parties have engaged in additional discovery and, as expected, additional evidence has come to light further discrediting Defendants' position. In particular, evidence produced by Getty Images in response to a document subpoena confirmed that, as Defendants' counsel already knew, Pearson did not purchase an "express license" to use any of the images in suit; instead, those licenses were granted to Pearson UK for different books. *See* McCulloch Ex. 2. Confronted with this evidence, Defendants now concede that their prior position lacked a factual basis. Discovery from Getty also revealed that Pearson did not acquire two of the images at issue from Getty directly, but instead acquired one of the photos from a third-party research firm and the other from an unknown source. *Id.* The new Getty evidence also revealed that all of Plaintiffs' images obtained from Getty Images were acquired as "Easy Access Downloads"[3] and thus were subject to the terms of a "composite/layout" license that expressly precluded use of images prior to purchasing a separate usage license. *Id.* Exs. 2-3; 6-7.

## SUMMARY OF ARGUMENT

There is no dispute that Pearson published Plaintiffs' images without an express license and did not even request permission to publish the images until several months or years after doing so. Defendants argue that their publishing Plaintiffs' photos was permitted under Pearson's course of dealing with Getty Images, despite the fact that the books were published before Pearson ever requested permission to use the photos, and notwithstanding that Pearson admits that it has not ever paid anyone any license fees for the rights to use Plaintiffs' photos.

This recent discovery merely confirms what has been clear all along, that Defendants'

---

[3] As previously explained to the Court, "Easy Access" is not a licensing model, but rather a download mechanism that allows Getty's customers to download non-watermarked copies of photos from Getty's website for "composite" or "layout" purposes. McCulloch Decl. Ex. 5. Getty Images' counsel has confirmed that when a customer downloads an image via "Easy Access" it is required to acknowledge, by checking a box on a pop-up screen, that it understands that it is not permitted to use the image for any purpose other than layouts. *Id.* Ex. 4.

implied license defense is utterly without merit.  The fact that Pearson did not even obtain certain images directly from Getty Images discredits Defendants' position; and where Pearson did obtain the images from Getty, the relevant agreements are unequivocal that Pearson did not have any rights to publish these photos and did not obtain any implied rights.  Despite the express language of every agreement between Pearson and Getty, Defendants' counsel have continued to maintain baseless defenses that are a charade contrived for purposes of this litigation. Defendants and their counsel should be sanctioned, including by striking these defenses.

## ARGUMENT

## I.     APPLICABLE STANDARD FOR IMPOSING SANCTIONS UNDER FRCP 11.

Rule 11 provides that any attorney "presenting to the court a pleading, written motion, or other paper" thereby "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law" and "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  FRCP 11(b)(2)-(3).  The signing party also certifies that the "pleading, written motion, or other paper" is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."  FRCP 11(b)(1).  The signing party thus has "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing." *Business Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991); *Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998) (FRCP 11 "'explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading

before it is signed'" (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir. 1985))).  The "reasonable inquiry" standard requires attorneys to seek credible information rather than proceed on mere suspicions or supposition.  *See Cal. Architectural Bldg. Prods. v. Franciscan Ceramics*, 818 F.2d 1466, 1472 (9th Cir. 1987).  Rule 11 prohibits the manufacture of baseless factual claims and authorizes sanctions upon a finding that a factual allegation "is utterly lacking in support."  *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996).  Rule 11 is violated even where only part of a pleading is frivolous.  *See Cross & Cross Properties v. Everett Allied Co.*, 886 F.2d 497, 505 (2d Cir. 1989).

Rule 11(c) authorizes the Court to impose sanctions for violation of these duties.  Unlike Section 1927, imposition of Rule 11 sanctions does not require a finding of subjective bad faith, only "objective unreasonableness."  *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir. 1997); *Wechsler v. Hunt Health Systems, Ltd.*, 216 F. Supp. 2d 347, 356 (S.D.N.Y. 2002) (citing *Simon DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 167 (2d Cir. 1999)).

Rule 11 sanctions "may be imposed either on the attorney who signs the paper, or on the party he represents, or on both."  *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2d Cir. 1986). "Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee."  FRCP 11(c)(1).

Rule 11 "emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable."  FRCP 11 cmt. re: 1993 amt. Consequently, "a litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit."  *Id.*

II.     **DEFENDANTS' IMPLIED LICENSE DEFENSE IS FRIVOLOUS.**

   A.     **Standard For Establishing Implied License.**

   Courts have recognized that "[a] nonexclusive license may be granted orally, or may even be implied from conduct." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990) (quoting 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 10.03[A], at 10–36 (1989)). Determining whether an implied license exists turns on the particular dealings between the parties. *Id.* As this Court has recognized, however, such licenses may be implied under only "certain narrow circumstances," none of which possibly exist here. *Country Road Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 328-29 (S.D.N.Y. 2003).

   Although various tests have been applied to determine whether an implied license exits, this Court previously determined that, "whichever test is applied, the question comes down to whether there was a 'meeting of the minds' between the parties to permit the particular usage at issue." *Psihoyos*, 855 F. Supp. 2d at 124 (collecting cases). Thus, the mere fact that Defendants acquired the images from one of Plaintiffs' licensing agents does not create an implied license. Rather, Defendants bear the burden to show that there was a "meeting of the minds" by *both parties* that permission was granted regarding "the *particular usage at issue*." *Id.*; *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 317 (S.D.N.Y. 2000) ("An implied license can only exist where an author creates a copyrighted work with *knowledge and intent* that the work would be used by another *for a specific purpose*." (emphasis added)); *Design Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996) (holding there must be evidence that "*both parties* to the transaction, not just the defendant, intended that the defendant could use or copy the plaintiff's work without liability for copyright infringement"); *Ulloa v. Universal Music & Video Distribution Corp.*, 303 F. Supp. 2d 409, 417 (S.D.N.Y. 2004) (requiring "manifestation

10

of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (citation omitted)).

**B.     The Factual Record Discredits Defendants' Implied License Defense.**

<u>Psihoyos' "Tyrannosaurus" Photo</u>

Pearson cannot show it reached the requisite "meeting of the minds" with Getty Images to publish Psihoyos' "Tyrannosaurus Gets A Cleaning."  In fact, the evidence shows that Pearson did not even acquire this image directly from Getty; nor is there any evidence showing that Getty even knew that the photo was provided to Pearson.  Getty's records show that this image was downloaded or licensed by Pearson UK, but not Pearson Education, Inc.  *See* McCulloch Decl. Ex. 2.  If Pearson UK provided this image to Pearson it not only would be in violation of the terms of its license from Getty, it also would have violated Section 602 of the Copyright Act precluding unauthorized importation and exportation.  17 U.S.C. § 602.

Getty also produced an invoice showing that this image was downloaded in January 2009 by Think Design Group LLC ("TDG"); but that again was for "composite" (layout) use.  *See* McCulloch Decl. Ex. 3.  Thus, according to the express terms of it license, this image "may not be used in any final materials distributed inside of your company *or any materials distributed outside of your company to the public*[.]"  *Id.* at 2, ¶ 2.1 (emphasis added).  Also, if TDG provided the image to Pearson then TDG violated the terms of its license which also states that the image "may not be distributed, sublicensed or made available for use or distribution separately or individually and no rights may be granted [to third parties] to the Licensed Material."  *Id.*  In other words, TDG was not permitted to transmit the image to Pearson, nor was it permitted to publish the photo.  In addition, the comp license expired after 30 days.  *Id.* at 1.

Even though Pearson never purchased a license to use Psihoyos' "Tyrannosaurus" photo,

11

it proceeded to publish it in *Intervention Student Reader* on May 1, 2009.  Nelson Decl. Ex. 2.
There were no communications between Pearson and Getty Images regarding the use of this
image in this book prior to publication; and certainly no correspondence that demonstrates that
Getty and Pearson reached a "meeting of the minds" that Pearson could publish the photo in this
particular book.  Rather, Pearson waited until December 18, 2009, *more than seven months after
publication*, to contact Science Faction—an entirely separate entity—to request permission.  *Id.*
Ex. 3.  Unsurprisingly, there were no communications between Pearson and Science Faction
regarding the "Tyrannosaurus" photo or this publication prior to this date.

Furthermore, although the book already had been printed, bound, and sold, Pearson's
December 2009 letter deceptively stated that it "*is working* on a program entitled Reading" and
"*is requesting* a non-exclusive permission and license" to use Psihoyos' photograph in a book in
that series.  *Id.* (emphasis added).  The "Permission Work Order" attached to Pearson's letter did
not disclose that book already had been published.  *Id.*  The e-mail transmitting this letter to
Science Faction also stated that Pearson "*wants to permission*" this image.  *Id.*

When Science Faction did not grant the requested license, Jerry Mangione, an Image
Rights Editor for Pearson, sent an e-mail to his supervisor, Julie Orr, on February 26, 2010,
almost *ten months after publication*, informing her that Psihoyos' "Tyrannosaurus" image
remained "***unpermissioned***."  *Id.* Ex. 5 (emphasis added).

**Psihoyos' "Iguanodon" Photo**

Pearson published Psihoyos' photo entitled "Vintage Sketch of an Iguanodon" in *Concept
Literacy Reader Grade 5,* "*Picturing the Past*" on August 28, 2009.  Nelson Decl. Ex. 2.
Pearson also included Psihoyos' image in ancillary materials associated with this title.  *Id.*
Although Defendants maintain that publishing Psihoyos' photo also was allowed under an

implied license from Getty, there is no evidence demonstrating that Pearson obtained this photo from Getty Images, either directly or otherwise.  The download records produced by Getty Images do not include *any* transactions by Pearson involving this image.  McCulloch Decl. Ex. 2.

Moreover, the pre-litigation record is clear that Pearson fully understood that it did not have permission to publish the photo at the time.  Although Pearson published the book in August 2009, it did not contact Science Faction to request permission to use Psihoyos' image until November 24, 2009, nearly *three months* late.  Nelson Decl. Ex. 9.  Once again, there were no prior communications between Pearson and Science Faction regarding the use of Psihoyos' image, and certainly none prior to publication.  Nor were there any communications between Pearson and Getty Images regarding the use of this image in this book (or any book) prior to publication.  And once again, even though the book already had been printed, bound, and sold, Pearson's November 2009 letter deceptively represented that it "*is working* on a program entitled Reading" and "*is requesting* a non-exclusive permission and license" to use Plaintiff Psihoyos' "Iguanodon" photograph in this publication.  *Id.* (emphasis added).  The "Permission Work Order" attached to that letter did not disclose that the book already had been published.  *Id.*

When Science Faction did not grant Pearson's license request, Mr. Mangione again alerted his supervisor that Psihoyos' "Iguanodon" image remained "***unpermissioned***." *Id.* Ex. 5.

### Reed's "Storm Researchers" Photo

The records from Getty show that Pearson downloaded Reed's photo titled "Storm Researchers in Action" via Easy Access for "comp" use only on April 1, 2008.  *See* McCulloch Decl. Ex. 2.  When downloading this image, Pearson was required to affirmatively acknowledge that its use of this image was limited to "composite" or layout purposes unless it purchased an additional license.  *Id.* ¶ 9.  The download record also shows that Getty explicitly advised

Pearson that the image was "Not Released" and cautioned Pearson that "[a]vailability for this image cannot be guaranteed until the time of purchase."  Nelson Decl. Ex. 6.

Even though Pearson obtained the image via Easy Access and had only "comp" rights, Pearson proceeded to publish this photo in *Conceptual Integrated Science Explorations* on December 26, 2008.  Nelson Decl. Ex. 2.  Pearson completed the second printing of this book on June 26, 2009.  *Id.*  Nevertheless, Pearson waited until December 1, 2009, almost a *full year after publication* and after at least *two printings* of this book, to contact Getty to request a license.  By that time, however, Science Faction and Getty Images had terminated their relationship, and thus Getty advised Pearson that "We are unable to license this image."  *Id.* Ex. 7.  Due to its own delay in contacting Getty, Pearson did not contact Science Faction to request permission to use Psihoyos' image until February 2010, more than *13 months after publication*.  *Id.* Ex. 8.  There were no communications between Pearson and Science Faction regarding the use of Psihoyos' image in this publication prior to this date.  Nor were there any communications between Pearson and Getty Images regarding the use of this image in this book prior to publication.

As is Pearson's practice, the February 2010 letter to Science Faction did not identify the publication date, and did not disclose that the book for which rights were being requested had been published in 2008.  Instead, Pearson's letter deceptively stated:  "The photographs will be included in the company's digital archive for internal storage and viewing purposes only and will not be re-used in any publication without payment of the requisite permission fee."  *Id.*  Again, Science Faction did not grant the requested license and did not send Pearson an invoice.

### Psihoyos' "Hundred Monkeys" Photo

The records from Getty show that Pearson downloaded Psihoyos' image entitled "One Hundred Monkeys Write Shakespeare" via Easy Access for "comp" use only on June 29, 2008.

14

*See* McCulloch Decl. Ex. 2.  Again, Pearson was required to affirmatively acknowledge that its use of this image was limited to "composite" or layout purposes unless it purchased an additional license.  *Id.* ¶ 9, Exs. 4 & 6.  Despite these restrictions, Pearson proceeded to publish Psihoyos' photo in its *Perspectives on Argument* book on October 31, 2008.  Nelson Decl.  Ex. 2.

Between April and September 2009 Pearson completed the first printing of the custom edition, the second printing of the student edition, and the second and third printings of the "custom" edition.  Nelson Decl.  Ex. 2.  Nevertheless, Pearson waited until January 15, 2010, over *14 months after publication*, to contact Science Faction to request permission to use Psihoyos' image.  *Id.* Ex. 11.  Once again, there were no prior communications between Pearson and Science Faction or Getty regarding the use of this image in this publication, and certainly none prior to publication.  And although numerous editions and printing of this book already had been printed, bound, and sold, Pearson's letter again deceptively stated:  "The photographs will be included in the company's digital archive for internal storage and viewing purposes only and will not be re-used in any publication without payment of the requisite permission fee."  *Id.*

Shockingly, on August 26, 2010—several weeks after this litigation was filed—Pearson sent Science Faction another letter requesting permission to use Plaintiff Psihoyos' "Hundred Monkeys" image in an eBook edition of this publication.  *Id.* Ex. 12.  In trying to explain why its request was coming *nearly two years late and after this suit was filed*, Pearson lamely explained: "Throughout the last year, Pearson has gone through a re-organization and now we are trying to clear up any outstanding invoices or permissions."  *Id.*

**C.    Pearson's Agreements With Getty Preclude An Implied License Defense.**

Defendants' implied license argument requires that the Defendants demonstrate that *both parties* reached a "meeting of the minds" allowing Pearson to publish these particular photos in

these publications before purchasing an express license.  Defendants and their counsel know that they cannot point to evidence satisfying this burden.

With respect to Psihoyos' "Tyrannosaurus" and "Iguanodon" photos, Pearson did not even acquire these images from Getty, *see* McCulloch Decl. Ex. 2, so Getty could not possibly have consented to Pearson's publishing them in a particular book without advance purchase of a license.  The implied license defense is even more specious with respect to the "Tyrannosaurus" photo that Pearson claims it obtained from TDG because TDG acquired the image under a "composite" license that allowed *internal layout use only* and expressly *precluded* publication of an image without prior purchase of a license.  McCulloch Decl. Ex. 3, at ¶ 2.1.  For the same reason, the fact that Pearson downloaded the "Hundred Monkeys" and "Storm Researchers" photos through Easy Access under a "comp" license also precludes any implied license.

The Easy Access agreement between Pearson and Getty Images allows Pearson to download images for "Composite/Layout Uses" or, if a separate license is purchased, "editorial use."  McCulloch Decl. Ex. 5.  Where no license fee is paid in advance and thus only composite uses are permitted, the Easy Access agreement is absolutely clear that Pearson "may not use the Licensed Material in any final materials distributed inside of your company or any materials distributed outside of your company or to the public."  *Id.*  The agreement also provides that "Licensed Material may be used for Composite/Layout Use at no cost for ninety (90) days only."  *Id.*  At that point, if Pearson intended to publish an image, it was required to purchase a usage license.  In the interim, the agreement provides that "Getty Images makes no representation and gives no warranty that rights to an Image will be available at the time of licensing."  *Id.*

In addition, every time Pearson downloaded any file (including Plaintiff's photos) via Easy Access it was required to explicitly acknowledge that it was not obtaining any right to use

16

the image for any purpose other than internal layouts only.   As counsel for Getty Images explained:

> [C]ustomers authorized to participate in the Easy Access program could download images from Getty Images' website only if they agreed to the governing terms and conditions. Whenever a customer attempted to download an image from the website under the Easy Access program, a copy of the terms and conditions governing the image and its use would appear on the customer's computer screen. Before the customer could proceed and complete the download, it had to click a button that appeared on the webpage, near the terms and conditions, stating that the customer consented to them.   Only after recording its consent could the customer complete the download. In other words, ***any customer downloading images through the Easy Access program had to affirmatively consent to the governing license terms before it could download any images***.

McCulloch Decl. Ex. 4 (emphasis added).   Although Getty Images does not maintain records of online acknowledgments, this consent requirement is mandatory for all Easy Access downloads and thus, as Getty Images' counsel put it: "evidence of the download is sufficient evidence of consent."   *Id.*   ("Getty Images did not keep redundant records specifically confirming customers' digital acceptance of the licensing terms because evidence of the download is sufficient evidence of consent.").   Thus, every time a customer (including both Pearson and Think Design) downloaded any image (including Plaintiffs' photos) through Easy Access, it was required to acknowledge its acceptance of Getty Images' "comp" license terms, which expressly provide that the customer "**may not use the Licensed Material in any final materials distributed inside of your company or any materials distributed outside of your company or to the public**."   *Id.* Ex. 6 (emphasis added); ¶ 9.

That Pearson was required to confirm that it was not obtaining any usage rights beyond *internal layout use only* when it downloaded Plaintiffs' images) via Easy Access directly discredits its implied license defense.   Contrary to Defendants' position in this litigation, the *express* terms of Pearson's license—which it was *required* to acknowledge before gaining access

to Plaintiffs' photos—precluded Pearson's publishing the photos without purchasing an additional license.

Moreover, because the entire purpose of Getty's "comp" download process is to allow its customers to create layouts before deciding whether to purchase an actual license, there cannot possibly have been the necessary meeting of the minds to establish a license. As this Court repeatedly has held, an implied license cannot exist where the licensor has doubt about whether a work will be used or the particular uses that will be made. *See Ulloa*, 303 F. Supp. 2d at 417 (no license where "there was no understanding that Plaintiff's recording would actually be used in the final version of the Izzo song"); *SHL Imaging*, 117 F. Supp. 2d at 317 (no implied license where plaintiff merely "suspected defendants might use the photographs for a catalogue").

### D. Both The Substance And Timing Of Pearson's Permission Requests Discredit Its Implied License Claim.

Pearson's correspondence with Science Faction further demonstrates that Pearson did not truly believe—prior to the defense concocted by its litigation counsel—that it already had permission to use Plaintiffs' photos in these publications. For instance, Pearson's December 18, 2009 letter to Science Faction states that Pearson "*is requesting* a non-exclusive permission and license" to use Psihoyos' "Tyrannosaurs" image in a publication and notes that the image always will appear "in the context of the page(s) for which *permission is sought*." Nelson Decl. Ex. 3. If Pearson believed that it had obtained permission previously, then Pearson would not have needed to *request* and *seek* permission. This same language appears in each of Pearson's letters to Science Faction and provides stark evidence that there was no meeting of the minds. Because Pearson had not even *requested* a license at the time of publication, it cannot possibly have *obtained* a license, even implicitly. *See Viacom Int'l, Inc. v. Fanzine Int'l, Inc.*, No. No. 98-cv3448, 2000 WL 1854903, at *4 (S.D.N.Y. July 12, 2000) (holding that there "cannot be . . . an

implicit acceptance of any request for a license because no such request was outstanding").

That no license existed is further evidenced by the fact that Jerry Mangione, Pearson's image researcher who contacted Science Faction to request a license, expressly advised his supervisor that these images remained "unpermissioned."  Nelson Decl. Ex. 5.  Such evidence is irreconcilable with the notion that Pearson believed it already had obtained permission to publish these photos, let alone that *mutual consent* had been achieved.

Defendants' position also is discredited by the fact that Pearson's standard billing request letters expressly stated:  "The photographs . . . will not be re-used in any publication without payment of the requisite permission fee."  Nelson Decl. Ex. 10.  This assurance was not new, as Pearson repeatedly promised vendors, including Psihoyos, that:  "We will not use your pictures without requesting permission ***in advance*** and agreeing on a reuse fee."  *See* McCulloch Decl. Ex. 8.  Defense counsel's attempt to revise the history of the parties' dealings is unavailing.

The fact that Pearson consistently promised Science Faction and Getty Images that it would not use images without purchasing a license in advance demonstrates that Defendants' "course of dealing" has been manufactured for this litigation and has no factual basis.  In fact, Julie Orr, the Permissions Manager who oversaw all of the projects at issue in this case and whose name appears on all of the permission request letters, expressly rejected the notion that the permission requests sent to Science Faction implied that Pearson was requesting rights retroactive to the date of publication.  *See* Nelson Decl. Ex. 22 at 67:12-23.  As she put it:  "We are not going out and seeking permissions for something that's been done in the past."  *Id.* at 121:20-25; 167:14—168:3 ("My understanding is that we have rights when they issue the invoice.").  When asked whether she agreed with Pearson's litigation position that obtaining an invoice months or years after publication was sufficient, she testified:  "No, we are not covered

19

for that [prior] period of time." *Id.* at 122:6—123:23. In fact, Ms. Orr was clear that "Yes, it would bother me" to learn that Pearson was contending in this litigation that invoices applied retroactively to uses that already had occurred. *Id.* at 171:20—172:6.

The timing of Pearson's requesting licenses from Getty and Science Faction also is significant. As shown above, Pearson first contacted Getty Images and Science Faction to request permission to publish photos in these books on December 18, 2009; November 24, 2009; December 1, 2009; and January 15, 2010. Nelson Decl. Exs. 3, 7, 9, 11. It is no coincidence that Pearson was sending out letters seeking licenses for "unpermissioned" photos at this time, since it had just recently completed a major audit (apparently by PricewaterhouseCoopers) to uncover copyright compliance problems, including the unlicensed use of third-party photos. *See* McCulloch Decl. Ex. 10. The audit final report, issued barely weeks earlier, noted that "we determined that controls did not exist in the process to verify that rights granted for third-party text and images were adequate." *Id.* at 5 (DEF0002127). The underlying data report for the audit found a shocking rate of unpermissioned use:

> A review of 2009 products that had images, indicated that **29 of 35 (83%) products released did not have all of the permissions received and paid prior to publication**. The 29 products had **7,852 (36%) photos that have been released without all of the permissions paid for prior to publication date**. This creates a risk to having to pay additional amounts since the products had been released without some of the photographers/illustrators approval. Management's initial research has uncovered that this non compliance with licensing requirement exists in products published prior to 2009.

McCulloch Decl. Ex. 11. In response to these staggering deficiencies, the audit committee recommended a number of policy changes, including that permissions be obtained and documented for all programs. Coincidentally, this undertaking was to be implemented beginning in September 2009, only two months before Pearson first contacted Getty Images and Science Faction regarding books that had been published months and years earlier. *Id.* Ex. 10 at 5.

20

The timing of Pearson's requesting licenses from Getty and Science Faction also is suspicious given that Psihoyos already had contacted Pearson to demand an audit of the uses of his photos, and Nancy Thornton, in-house counsel for Pearson, agreed to provide that report in August 21, 2009.  McCulloch Decl. Ex. 9.  Although Ms. Soares confirmed that she compiled the usage chart, *id.* Ex. 7.  Pearson never provided it in 2009, nor in this action.

This evidence shows that Pearson was contacting Getty to clean up unpermissioned uses that Pearson discovered during one or both of these audits.

> ### E.     Pearson's Preferred Vendor Discount Pricing Agreements Do Not Create An Implied License.

Defendants' Second Amended Answers contend that "Plaintiffs' claims are barred, in whole or in part, by agreements between Pearson and Plaintiffs' agents."  (*See, e.g.*, Dkt. No. 70 at ¶ 159.)  Although Defendants do not identify the particular "agreements" in support of this defense, they do allege that "Plaintiffs' agents, including Science Faction, have preferred vendor relationships with Pearson" and that the preferred vendor agreements "do not bar completion of permission-related documents after publication."  (*Id.* ¶¶ 160-62.)

In its order regarding summary judgment, the Court held that Pearson's Discount Price Agreement with Getty Images is merely a pricing agreement that "did not grant any actual usage rights to the images."  *Psihoyos*, 855 F. Supp. 2d at 108.  This ruling was not surprising given that the agreements themselves disclaim any usage rights and expressly provided that "individual licenses will be granted by Licensor to Licensee subject to the terms and conditions of the License Agreement(s)."  Nelson Decl. Ex. 20.  This is significant because, as the Court noted, the standard Getty license agreement states:  "Except as expressly stated in this Agreement, Getty Images grants Licensee no right or license, express or implied, to the Licensed Material."  *Psihoyos*, 855 F. Supp. 2d at 108.

All of Pearson's witnesses also agreed that these agreements do not grant Pearson a license to use particular photos unless a subsequent license is purchased. For instance, Pearson's Rule 30(b)(6) witness in the *Wu II* action testified as follows:

> Q:  And you believe that those [preferred vendor] agreements grant some rights to Pearson to use photographs?
>
> A:  No, I don't.
>
>     MR. CHURCH: Objection to form, calls for a legal conclusion.
>
> A:  I don't think that.

McCulloch Decl. Ex. 12 at 192:11-23; 71:9-13 ("Q.  Is it Pearson's policy that a preferred vendor agreement is sufficient to have permission to publish that vendor's photographs?  A. No, quite the contrary.")  This is not surprising given that he also testified that "the requirement to secure permission for a specific image is . . . the same" when dealing with preferred vendors and any other vendor.  *Id.* at 76:2-24.  Pearson's witness even conceded that its specific agreement with Getty Images does not grant it any rights to use particular photographs:

> Q:  Well, Exhibit 3 [Getty "Discount Price Agreement"], for example, doesn't grant any rights to Pearson to publish any particular photographs, does it?
>
> A:  No, it doesn't.  But I would – what I'm trying to say is it defines the rights, that ***if rights are granted upon a request*** these are the rights as defined that are granted.

*Id.* at 81:18—25 (emphasis added).  Pearson's 30(b)(6) representative offered this testimony several months before Defendants filed their Second Amended Answers in this action.  Sanctions thus are warranted because Defendants and their counsel were aware that this defense lacked factual support when they asserted it.  Sanctions also are supported because Defendants and their counsel ignored repeated calls to withdraw this frivolous position.   Indeed, Plaintiffs raised this exact argument in their Motion for Sanctions served in July 2011, well before the parties briefed the issue on summary judgment.  *See* McCulloch Decl. Ex. 1 at 19-22.

**F.      Pearson's Image Storage Agreement with Getty Images Precludes An Implied License Defense.**

Pearson maintains a vast digital archive of photographic content known as the Pearson Asset Library ("PAL").  This acronym is misleading, however, because a significant portion of the images in this archive are not Pearson's "assets" but instead are owned by third parties, many of whom have no idea that Pearson is retaining their images in this archive.  The PAL repository includes entire libraries of images that certain vendors contractually agreed to "bulk upload" to the PAL.  According to Pearson's Rule 30(b)(6) representative in the *Wu II* action, each of these agreements contains "restrictive language" that, according to him, makes clear that Pearson cannot use images delivered to Pearson without first obtaining separate permission.  *See* McCulloch Decl. Ex. 12 at 47:17—48:12.

Getty Images and Pearson entered into one of these PAL "Image Storage Agreements" in June 2005.  Nelson Decl. Ex. 1.  This agreement states that its terms apply not only to bulk uploaded images, but also to any images that Getty Images "will deliver to Pearson . . . pursuant to Pearson's research requests or special requests made periodically by Pearson."  *Id.*  As with Easy Access downloads, Pearson's rights to use images delivered by Getty Images are expressly limited "to (i) view[ing] the Images; and reproduc[ing] the Images, in order to store the Images, on the PAL for the purpose of aiding Pearson in its image licensing decisions."  *Id.*  No other rights were granted to Pearson.  In fact, the Agreement expressly provides:

> Pearson acknowledges that **no actual image reproduction rights**, outside of inclusion on the PAL, are granted by this Agreement.  Any other use of the Images requires Pearson and Getty Images to entire into **a separate license agreement**, requiring the payment of license fees to Getty Images by Pearson in exchange for Pearson's right to reproduce and use the Images. . . .  **There are no implied licenses to any of the Images**.

*Id.* (emphasis added).

As with the Easy Access and Preferred Vendor agreements, there is no serious dispute that this "Image Storage Agreement" precludes an implied license defense.  As Pearson's Rule 30(b)(6) designee previously testified:

Q:  So, it's not Pearson's policy that it has the right to do whatever it wants with third-party content . . . because it's in PAL, right?

A:   It is not.

…

Q:  It's Pearson's understanding that when there are images in PAL there are subsequent permissions required, in some cases, to use those images downstream?

MR. CHURCH: Objection to form, calls for a legal judgment.

A:  The importance of protecting the use of images to be in compliance with the vendor and rights-holders requests and conditions caused us to build information into the system that ***made it apparent that it was necessary to follow the permissioning process to secure rights if those images wanted to be used***, and any user that search for images in PAL would see that information immediately.

McCulloch Decl. Ex. 12 at 47:17—49:12 (emphasis added).

Both the Easy Access and PAL Upload Agreements expressly and unequivocally demonstrate that Pearson did not acquire any rights to publish Plaintiffs' photos unless and until it purchased an express license, which did not happen.  These agreements dispel any possible notion that Getty Images and Pearson reached a meeting of the minds that allowed Pearson to publish any images that Pearson acquired from Getty prior to purchasing a license.

## G.    Pearson's Settlements With Getty Images Discredits Defendant's Position.

After summary judgment motions were filed, Pearson produced evidence that Getty asserted several infringement claims against Pearson for using images without first obtaining the requisite license and that Pearson negotiated a settlement of the claims.  *See, e.g.*, McCulloch Decl. Ex. 13 (Getty Case No. 1004128).  This evidence is particularly significant because (i) it involves an infringement claim by Getty related to Pearson's unlicensed use of an image on a website, even though Pearson had purchased a license to publish the photo in the print edition of

24

the publication; and (ii) it occurred after the publishing of the photos in suit, and right around the time that this action was filed.  *Id.*  More recently, Pearson produced additional documents demonstrating that Getty continues to pursue claims where Pearson cannot demonstrate it purchased a prior license.  *Id.* Ex. 14 (Getty Case No. 1090962 on April 26, 2011).

If Defendants' "course of dealing" theory had any merit, then Getty Images would not have identified these uses as unauthorized and infringing, but rather would have allowed Pearson to purchase the necessary license whenever Pearson happened to get around to it—as Pearson contends it was permitted to do with respect to the uses at issue here.  Instead, Getty pursued these unauthorized uses, and demanded that Pearson pay a punitive settlement.

## III.    SANCTIONS ARE WARRANTED.

Defendants' "implied license" and "agreements" and "course of dealing" defenses are not do not have any factual support.  These defenses are contradicted by the express language of Pearson's Easy Access agreement and the "composite" license terms, both of which prohibit any publishing of photos without the purchase of a separate license.  These defenses are precluded by Pearson's Image Storage Agreements with Getty which expressly disclaims that any implied rights are granted to images delivered to Pearson.  These defenses were rejected by the testimony of Pearson's own witnesses.  The defenses are discredited by the language of delivery documents and Pearson's own billing request letters and its correspondence with Plaintiffs' agents.

Despite this litany of evidence showing that a "meeting of the minds" was never reached allowing Pearson to publish these photos in these specific books without a license, Defendants continue to advance these baseless arguments.  Defendants have been repeatedly advised that these defenses lacked evidentiary support, but Defendants have chosen to ignore the evidence, resulting in a tremendous waste of the Court's and the parties' time and resources.

**CONLCUSION**

Defendants' position is objectively unreasonable and warrants sanctions against Defendants and their counsel, including the striking of the "implied license" and "course of dealing" and "agreements" defenses and awarding costs and expenses incurred since at least May 12, 2011.


Dated:  New York, New York
        October 10, 2012

                              NELSON & McCULLOCH LLP


                              _____
                              Danial A. Nelson (DN4940)
                              Kevin P. McCulloch (KM0530)
                              The Chrysler Building
                              405 Lexington Ave., 26th Floor
                              New York, New York 10174
                              T: (212) 907-6677
                              F: (646) 308-1178

                              dnelson@nelsonmcculloch.com
                              kmcculloch@nelsonmcculloch.com

                              *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Danial A. Nelson, an attorney, hereby certify that I caused a true and correct copy of the foregoing Motion for Sanctions Under Rule 11 to be served via electronic mail on all counsel listed below on this 10th day of October, 2012.

J. Gordon Cooney, Jr.
David W. Marston, Jr.
Ezra Dodd Church
1701 Market Street
Philadelphia, PA 19103
Tel: 215-963-5000
Fax: 215-963-5001
jgcooney@morganlewis.com
dmarston@morganlewis.com
echurch@morganlewis.com

Namita E. Mani
Shana R. Cappell
101 Park Avenue
New York, New York 10178
Tel: 212-309-6000
Fax: 212-309-6001
nmani@morganlewis.com
scappell@morganlewis.com

Dated:  October 10, 2012

_____
Danial A. Nelson
dnelson@nelsonmcculloch.com

27